**Cornelius CONNORS, Individually and as representative of a Class of persons similarly situated, Plaintiff,**

v.

**LEXINGTON INSURANCE COMPANY, Southeastern Risk Specialists, Inc., J.F. Gassie, Emery-Richardson, Inc., and Robert D. Putvin, Defendants.**

No. CV 85–1381.

United States District Court, E.D. New York.

Aug. 12, 1987.

Lawrence Milberg, Milberg, Weiss, Bershad, Specthrie & Lerach, New York City, for plaintiff.

Darrell K. Fennell, Fennell & Minkoff, New York City, for defendants Lexington Ins. Co. and Southeastern Risk Specialists, Inc.

David A. Boyar, D'Amato & Lynch, New York City, for defendants, Emery-Richardson, Inc., J.F. Gassie and Robert D. Putvin.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff Cornelius Connors commenced this action on April 12, 1985 on behalf of himself and all others similarly situated against defendants Lexington Insurance Company, Emery-Richardson, Inc., J.F. Gassie, and Robert D. Putvin, alleging violations of section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b), and rule 10b–5, 17 C.F.R. § 240.10b–5, promulgated thereunder (Count One), common law fraud and deceit (Count Two), and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968 (Count Three). On July 15, 1985, plaintiff filed an amended class action complaint. On May 23, 1986, the parties consented to the filing of a second amended complaint adding Southeastern Risk Specialists, Inc. as an additional defendant.[1]

Currently before the Court are defendants' motion to dismiss pursuant to rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure,[2] plaintiff's motion for class certification pursuant to rule 23(c)(1) of the Federal Rules of Civil Procedure, and plaintiff's motion for a change of venue to the Southern District of Florida pursuant to 28 U.S.C. § 1404(a). For the reasons set forth below, defendants' motions to dismiss are denied and plaintiff's motion for a change of venue is granted. In view of the pending class certification motion in an action virtually identical to this one in the Southern District of Florida, this Court will not reach plaintiff Connors' class certification motion but will instead leave it to the consideration of the transferee court in the expectation that the two actions will be consolidated.

## I. BACKGROUND

Plaintiff's allegations, which the Court must accept as true on a motion to dismiss, are essentially as follows: plaintiff is a member of a purported class of thousands of persons who participated in a "Buy Back, Redelivery, Rebate Program" (the "Program") sponsored by International Gold Bullion Exchange ("IGBE"), a company that engaged in, and advertised itself extensively in prominent newspapers as having expertise in, the business of marketing gold and silver ("precious metals"). Under this Program, which was developed in August 1982, customers such as plaintiff sent to IGBE either the purchase price of precious metals, which IGBE then used to buy precious metals on the market for each customer's account, or precious metals already owned by the customer. In either case, IGBE promised to store the metals, *in specie* and unencumbered, in its safe deposit vault; to provide insurance from Lexington Insurance Company ("Lexington") "guaranteeing and insuring the safety" of the customer's precious metals; to pay to each customer 1½% of the value of his or her metal each month for at least

---

1. Pursuant to this agreement, defendants' motion to dismiss, which was pending before the Court, was deemed applicable to the second amended complaint. All references in this opinion shall therefore be to the *second* amended complaint as well, although references in the memoranda submitted with respect to the motions to dismiss are to the amended complaint.

2. Defendant Southeastern joined defendant Lexington's motion to dismiss and its opposition to plaintiff's motion for class certification.

three months; and to continue these payments as long as the customer desired or, at the end of the three-month period or thirty days' notice thereafter, to deliver the metals to the customer.

Sometime in 1982, IGBE entered into a contract of insurance with Lexington, assertedly "to create the impression that it was complying with its obligations" under the Program as described to the public. Complaint ¶ 20. This insurance was placed through Emery-Richardson ("Emery"), a Florida insurance consultant and agency that allegedly acted as Lexington's duly authorized agent in the transactions at issue. Emery, in turn, approached Southeastern Risk Specialists, Inc. ("Southeastern") to obtain the requested insurance coverage from Lexington for IGBE. Southeastern, which has its principal place of business in Georgia and is an intermediary broker engaged in the business of obtaining insurance required by its clients, also allegedly acted as Lexington's duly authorized agent in these transactions. The insurance obtained from Lexington was to be "administered and supervised" by Emery and Emery was assigned to be a liaison with IGBE on behalf of Lexington and Southeastern.

The contract of insurance was allegedly entered into to enable IGBE to issue a Depository Vault Receipt to each Program participant representing that the participant's specific precious metals would be maintained under the care, custody, and control of IGBE in its vault and would be insured by Lexington. Acting as Lexington's duly authorized agent and at the behest of IGBE, Emery provided to IGBE Certificates of Insurance that corresponded to each Depository Vault Receipt. Each Certificate of Insurance was signed by the president of Emery, J.F. Gassie, or by another duly authorized officer of Emery. The certificates were reviewed and approved by Southeastern, acting as Lexington's duly authorized agent.

Relying on defendants' misrepresentations and in ignorance of the fact that the underlying insurance policy specifically excluded insurance coverage for theft, conversion, or other dishonest acts by IGBE or its principals, plaintiff purchased from and/or entrusted to IBGE precious metals in August and December 1982. After sending the metal or purchase price, plaintiff received from IGBE a confirming invoice, a Certificate of Ownership signed by IGBE, a Depository Vault Receipt, and a Certificate of Insurance signed by Gassie on behalf of Emery.

IGBE, however, did not use the moneys mailed to it by plaintiff or other class members to purchase precious metals for them and did not safely store the precious metals in its vault; instead, IGBE converted approximately $80,000,000 in funds and precious metals entrusted to it by the over 20,000 Program participants. IGBE, which had insufficient capital to carry out the program, is now insolvent and bankrupt. Lexington has repudiated and disclaimed the insurance coverage, asserting that the exclusion clause bars any right of plaintiff and class members to recover under the policy.

## II. MOTIONS TO DISMISS

Defendants move to dismiss pursuant to rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. With respect to Count One, defendants assert that the complaint suffers from the following defects: the Program as described does not constitute or involve a security within the meaning of the federal securities laws; plaintiff has failed to allege the element of "in connection with" as required by section 10(b) and rule 10b–5; plaintiff has failed to establish loss causation and transaction causation; plaintiff has failed to establish a basis for the imposition of liability against defendants as aiders and abettors; plaintiff has failed to allege securities fraud with the requisite particularity; and defendants Lexington and Southeastern assert that plaintiff has failed to allege a basis for the imposition of liability against them under the doctrine of respondeat superior. With respect to Count Two, Lexington and Southeastern assert that the complaint is defective in failing to allege the law upon which plaintiff is relying and all defendants assert that plaintiff has failed to allege

fraud with the requisite particularity. With respect to Count Three, defendants assert that the complaint does not state a claim because: defendants cannot be both the "enterprise" and the "person" within the meaning of RICO; plaintiff has failed to establish two acts of racketeering activity; and plaintiff has failed to establish that defendants committed two acts of racketeering activity.

Bearing in mind that on a motion to dismiss, plaintiff's complaint must be read with "great generosity," *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 558 (2d Cir.1985) (citing *Conley v. Gibson*, 355 U.S. 41, 47–48, 78 S.Ct. 99, 102–103, 2 L.Ed.2d 80 (1957)), and that the Court must accept as true the material allegations in the complaint and construe them in the light most favorable to the plaintiff, and that the complaint may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957); *accord Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984), the Court concludes that defendants' motions to dismiss must be denied for the reasons set forth below.

## III. THE SECURITIES COUNT

Plaintiff asserts that defendants violated section 10(b) and rule 10b–5. Specifically, plaintiff asserts that the Certificates of Insurance provided by defendants to IGBE for mailing to plaintiff and the class were misleading in that they omitted the material fact that the underlying insurance policies provided no insurance coverage for the purpose for which they were issued, to assure the safety of the customers' precious metals. The Certificates did not include a specific reference to the exclusion and did not have a copy of the underlying policy attached to them. The purpose of the insurance policy and the promise of insurance coverage was to persuade purchasers to believe that their investments were safe. Defendants were aware of IGBE's scheme and knew that the representations regarding insurance and the mailing of the Certificates of Insurance were integral to IGBE's ability to extract millions of dollars from Program participants. Defendants also knew that Program participants were relying upon the alleged insurance coverage in making their decisions to participate. Defendants, acting individually and collectively pursuant to a common scheme and plan, used deceptive practices, made false and misleading statements, and omitted to state material facts required to make other facts in the circumstances in which they were made not misleading.

### A. Was IGBE's Buy-Back, Redelivery, and Rebate Program a "Security"?

The threshold inquiry raised by defendants' motions to dismiss is whether the Program was a security within the meaning of the federal securities laws—in particular, 15 U.S.C. § 77b(1) and 15 U.S.C. § 78c(a)(10). Defendants assert that the Program did not constitute or involve a security but was merely a bailment. Plaintiff argues that the Program was an "evidence of indebtedness" and an "investment contract" within the meaning of these two sections of the securities laws. Because the Court finds that the complaint sufficiently alleges that the Program was an investment contract, the issue of whether the Program was also an evidence of indebtedness will not be addressed.

### (1) *Investment Contracts*

The Supreme Court has established a five-part test for determining whether something is an investment contract: "[A]n investment contract ... means a contract, transaction or scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of the promoter or a third party ...," *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1103, 90 L.Ed. 1244 (1946); *accord United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975), and [5] risks loss, *Marine Bank v. Weaver*, 455 U.S. 551, 557–59, 102 S.Ct. 1220, 71 L.Ed.2d 409 (1982). *See Gary*

Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, 756 F.2d 230, 239 (2d Cir.1985). The major dispute between the parties centers on whether the second, third, and fourth elements have been satisfied.

#### (a) *Common Enterprise*

A common enterprise has been described as one in which "the fortunes of all investors are inextricably tied to the efficacy [of the promoter's efforts]." *SEC v. Brigadoon Scotch Distributor's, Ltd.,* 388 F.Supp. 1288, 1291 (S.D.N.Y.1975) (quoting *SEC v. Koscat Interplanetary, Inc.,* 497 F.2d 473, 479 (5th Cir.1974)). The courts are divided between two basic approaches used to determine whether this element is satisfied the "horizontal commonality" approach, which focuses on whether investors have pooled their money in a way that is tied to the overall success of the venture; or the "vertical commonality" approach, which focuses on the relationship between the investor and the promoter and on whether the fortunes of investors are dependent upon the efforts of the promoter. *See generally In re Energy Systems Equipment Leasing Securities Litigation,* 642 F.Supp. 718, 734–35 (E.D.N.Y.1986) (discussing these approaches and citing cases).

The Second Circuit has not determined which approach should be employed and the district court decisions in this circuit have varied. *See id.* Without determining whether one approach is more appropriate than the other, this Court concludes that plaintiff's showing is sufficient under both the vertical [3] and horizontal commonality approaches.

Defendants argue that the Program did not involve a common enterprise because IGBE promised to hold the participant's metals *in specie* and unencumbered and the monthly rebate was a fixed amount, not dependent on any change in value and not conditioned upon IGBE's profits. Thus, according to defendants, the profitability of the metals and the customer's right to receive the rebate were not related to the fortunes or future profitability of IGBE.

■ While defendants' arguments are not devoid of merit, the complaint, read liberally, passes muster by alleging that (1) notwithstanding IGBE's promises to the contrary, IGBE induced Program participation so that it could use the funds to speculate against the precious metals markets, Complaint ¶ 26(c), thus showing a pooling of funds; and (2) participants presumably relied on IGBE's touted expertise and its continued ability to make a profit, thus showing the requisite vertical relationship. Plaintiff's "fortune" was accordingly tied not only to IGBE's continued solvency, but, more importantly, to IGBE's continued success, which would ensure a continued ability to pay the monthly "profit." Defendants' argument that any increase in the value of the metals depended solely on market conditions may be true but ignores the significance of IGBE's promise to pay a fixed rebate for at least three months regardless of market changes. Accordingly, the "fortunes" of Program participants and IGBE rose and fell together.

#### (b) *Profits*

■ This element is perhaps the key consideration with respect to whether the Program was an investment contract. Defendants argue that the monthly rebate was not a profit because it did not fall within the definition of the term as set forth by the Supreme Court—that is, "either capital appreciation resulting from the development of the initial investment ... or a participation in earnings resulting from the use of investors' funds." *Forman,* 421 U.S. at 852, 95 S.Ct. at 2060. However, as mentioned above, plaintiff has alleged that notwithstanding IGBE's promise to hold the precious metals *in specie* and unencumbered, IGBE in fact used the purchase

---

3. At this stage of the proceedings, plaintiff's showing is sufficient under both the more restrictive, *see, e.g., SEC v. Continental Commodities Corp.,* 497 F.2d 516 (5th Cir.1974), or broader, *see, e.g., Meyer v. Thomas & McKinnon Au-*

*chincloss Kohlmeyer, Inc.,* 686 F.2d 818 (9th Cir.1982), *cert. denied,* 460 U.S. 1023, 103 S.Ct. 1275, 75 L.Ed.2d 495 (1983), interpretations of vertical commonality. *See generally In re Energy Systems,* 642 F.Supp. at 734–35.

price and metals to speculate against the market. Accepting, as it must, the truth of the material allegations of the complaint and construing them, as it must, in the light most favorable to the plaintiff, the complaint may be read by the Court as alleging that IGBE planned to provide "earnings" to the participants that resulted from the use of the participants' funds. This conclusion satisfies the *Forman* standard.

Defendants also argue that the rebate involved a fixed rate of return and was not dependent upon any "development" activities or investment efforts by IGBE and was therefore not a profit. While programs involving a fixed rate of return often are deemed not to be securities, *see, e.g., FBS Financial, Inc. v. CleveTrust Realty Investors,* [1978 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,341, at 93,145 (N.D.Ohio Dec. 23, 1977) [Available on WESTLAW, DCT database], there are cases in which they *are* so deemed, *see, e.g., Sauve v. K.C. Inc.,* 91 Wash.2d 698, 591 P.2d 1207 (1979) (en banc); *cf. SEC v. G. Weeks Securities, Inc.,* 678 F.2d 649 (6th Cir.1982). Therefore, the fact that the rebate involved a fixed rate of return is not dispositive.

(c) *Solely From the Efforts of the Promoter*

Initially, the Court notes that the term "solely" has been construed more broadly than it would appear from reading the literal language of *Howey.* The term has been interpreted to mean those efforts that are "undeniably significant . . ., those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973).

While the complaint is not as detailed as it might be, it gives rise to a reasonable inference that IGBE's ability to pay the rebate ("profit") was based significantly, if not solely, on IGBE's successful business activities and efforts. Indeed, IGBE touted itself as an expert in the precious metals market and investors relied on that representation. On the face of the complaint, plaintiff has at least raised the inference that IGBE implicitly promised to use its skill and effort in operating the Program and in guaranteeing an 18% annual rate of return to each investor. This conclusion is reinforced by the Second Circuit's emphasis on the significance of an investor's decision to invest "made in reliance upon the efforts, knowledge and skill" of the promoter in determining whether a particular transaction meets this element of the investment contract test. *Gary Plastic,* 756 F.2d at 240–41.

Notwithstanding defendants' argument that IGBE played no role in the management of the investment because it did not promise to market the metals and did not provide investment advice, it is clear that participation was based on the promise of a guaranteed return regardless of market conditions. Plaintiff has not alleged that investors participated in the hope that their metals would increase in value, but rather in the expectation that IGBE's efforts would enable it to continue paying the rebate.

Furthermore, defendants' argument that IGBE, unlike the promoters in *Howey,* provided no services is without merit. IGBE specifically represented that it would procure insurance and would safely store the metals, thus enhancing the attractiveness of Program as an investment vehicle.

(2) *Other Factors Supporting a Finding that the Transaction was or Involved a Security*

Defendants note that the Securities and Exchange Commission ("SEC") has determined that several programs similar to IGBE's did not involve a security. Defendants cite, for instance, a no-action ruling by the SEC in connection with three proposed gold sales programs. *See* Memorandum of Law in Support of Defendant Lexington Insurance Company's Motion to Dismiss at 16 (citing SEC No-Action Position Relating to Certain Offerings of Gold, Securities Act Release No. 5552; Exchange Act Release No. 11156, [1974–75 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 80,037, at 84,811 (Dec.

26, 1974)). Under these proposed programs, sellers were to hold the purchasers' gold *in specie* and unencumbered in a depository vault, were to provide insurance, and were to deliver the gold upon each purchaser's request and presentation of a certificate reflecting the amount of gold held. The SEC found that these programs were not securities based on the following conclusions: (1) the economic benefit to the purchaser would not be derived from the managerial efforts of the seller as any profit was solely contingent upon market fluctuations, (2) the services offered were not deemed to be managerial because (a) purchasers paid full price and did not buy on margin, (b) the services offered were limited to storage and insurance, and (c) the seller was not obliged to repurchase or ensure re-sale of the gold. As plaintiff notes, however, it is significant that these three programs and many of the others reviewed by the SEC in the 1970s did not involve a guaranteed 18% annual rate of return independent of market fluctuations. Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss at 9 n. * *.

Of more significance is the SEC's finding, not cited by any of the parties, that the following two programs could potentially be characterized as "securities": a cash purchase program proposed by a securities investment firm that would provide no storage but would *"tout* [the] precious metals as an *investment medium appropriate for the entire investment public"* and would offer investment advice, *Investment Rarities, Inc.,* SEC No-Action Letter, [1975–76 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 80,235, at 85,487 (July 5, 1975) (emphasis added); and a "rental" plan to be offered through advertisements whereby the offeror would pay the owner 10¢ per troy ounce per month and, at the end of the rental period, return the original weight of silver to the owner, *Rare Metals Investment Corp.,* SEC No-Action Letter, [1973–74 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 79,752, at 84,025 (Mar. 28, 1974).

Finally, the Court notes with interest, although it is not bound in any way by it, that the SEC apparently concluded that IGBE's Program constituted a security. In a Staff Report to the Senate, not cited by any of the parties, the following was noted:

A record indicating the opening of SEC's formal inquiry into IGBE was filed in the SEC March 22, 1983. That document, entitled 'matter under inquiry', referred to the IGBE offering as an 'investment contract' involving 'evidence of indebtedness'. The subject matter of the inquiry was classified as fraud in the offer and sale of securities and the tendering of unregistered securities.

March 25, 1983, was the date of SEC Miami's first comprehensive analysis of SEC's jurisdictional basis over IGBE's offerings. In an extensive intraoffice legal memorandum it was concluded that the IGBE offer involved the sale of securities with [sic] the purview of the SEC's jurisdictional limitations.

Whether SEC intended to act upon this determination is unknown. Since IGBE was forced into receivership the SEC was precluded from pursuing the matter further.

*Commodity Investment Fraud II, Hearings Before the Permanent Subcommittee on Investigations of the Senate Committee on Governmental Affairs,* 98th Cong., 2d Sess. 145, 170 (1984).

B. *"In Connection With"*

Having determined that the Program involved a "security," the next inquiry is whether plaintiff has adequately alleged that defendants' false and misleading statements were made "in connection with" the purchase or sale of the security as required by section 10(b) and rule 10b–5. Defendants' 12(b)(6) motion with respect to the "in connection with" requirement is essentially based on the following assertions: (1) that any allegedly false or misleading documents issued by them or referring to them—e.g., the Depository Vault receipt indicating that plaintiff's metal was insured by Lexington and the Certificate of Insurance signed by Emery's president, Gassie—were received by plaintiff *after* plaintiff's purchase of the alleged "security" and that plaintiff therefore could not

have relied on these documents in making his initial investment decision; and (2) that any post-purchase "lulling" of plaintiff based on the assurance as to insurance coverage, which might have induced him to leave his metal in IGBE's vault, is not cognizable as a section 10(b) or rule 10b–5 violation in this circuit.

■ Defendants are, of course, correct in their argument that in this circuit, plaintiff must show that the omission or misleading statement occurred *"prior to or contemporaneous with"* the purchase or sale. *See, e.g., Bosio v. Norbay Securities, Inc.,* 599 F.Supp. 1563, 1566 (E.D.N.Y.1985) (emphasis in original) (quoting *Freschi v. Grand Coal Venture,* 551 F.Supp. 1220, 1227 (S.D.N.Y.1982)). Statements made subsequently, even if fraudulent, do not make out a 10b–5 violation. However, a review of the complaint reveals several instances in which plaintiff alleges that he relied on representations made *prior* to his purchase that insurance coverage would be provided. For instance, paragraph 17 states that "[t]he Program ... involved IGBE's undertaking to maintain such Precious Metals in its safe deposit vault and to provide insurance from Lexington 'guaranteeing and insuring the safety' of the customer's Precious Metals." Paragraph 19 states that "[p]laintiff and the other Class members thus relied on at least a three-pronged representation: ... (b) the safety of the metals would be guaranteed and insured by Lexington to protect the customer...."

The complaint also explicitly alleges that "[d]efendants furnished the Certificates of Insurance to IGBE for mailing" in accordance with the Program and that defendants *"knew* that they were being sent by IGBE in accordance with IBGE's representations to Plaintiff and the Class that there was insurance covering the safety of their metals." Complaint ¶ 28 (emphasis added). Moreover, plaintiff alleges that "the purpose of the policy under the IGBE Program was to persuade Plaintiff and the Class Members to rely on the safety and maintenance of the Precious Metals by IGBE in its vault and to assure them that the Met-

als would be and remain in the vault...." Complaint ¶ 26(e). Finally, the complaint alleges that defendants "were aware of the plan and scheme of IGBE to sell Precious Metals under the Program and *knew that the misrepresentations regarding insurance* and the mailing of the Certificates of Insurance to Class Members were *integral* to the ability of IGBE through the Program to extract millions of dollars from the Class." Complaint ¶ 30 (emphasis added).

■ Thus, plaintiff's allegations that he bought his precious metals under the Program relying on representations of insurance made *prior* to the purchase are sufficient to withstand defendants' motions to dismiss. The Court agrees with plaintiff that defendants' argument is based on a misreading of the complaint and raises issues of fact that are best resolved at trial or on a motion for summary judgment.

■ Moreover, the complaint at least implicitly raises another basis for denying defendants' motions. While defendants are correct that generally any post-purchase fraud inducing plaintiff not to pull out of the Program would be inadequate in this circuit as a basis for establishing 10b–5 liability, *see, e.g., Abrahamson v. Fleschner,* 568 F.2d 862, 868 (2d Cir.1977) ("requirement of fraud in connection with the purchase or sale of a security is not satisfied by an allegation that plaintiffs were induced *not* to sell their securities") (emphasis in original) (citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737–38, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975)), *cert. denied,* 436 U.S. 905, 98 S.Ct. 2236, 56 L.Ed.2d 403 (1978); *Troyer v. Karcagi,* 476 F.Supp. 1142, 1148 (S.D.N.Y. 1979) (no claim if fraudulent statement induced "mere retention" of funds in a discretionary account), plaintiff has alleged more than that. Specifically, plaintiff alleges that he made two separate "purchases"—one in August 1982 and one in December 1982. *See* Complaint ¶ 24. Thus, even if defendants were correct that plaintiff received allegedly fraudulent documents only *after* his initial purchase, these documents could have induced his *second* purchase. There is ample authority in this

circuit for the proposition that any subsequent purchase—that is, any new payment of money representing a *new* decision to invest—that has a causal relationship to the alleged fraudulent act can constitute a 10b–5 violation. *See, e.g., Freschi v. Grand Coal Venture,* 551 F.Supp. 1220, 1227–28 (S.D.N.Y.1982); *Troyer,* 476 F.Supp. at 1148–49.

Because plaintiff's complaint can be sustained on the grounds mentioned above, it is unnecessary to address plaintiff's "lulling" argument.

## C. *Causation*

In *Bennett v. U.S. Trust Co.,* 770 F.2d 308, 313 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986), the Second Circuit stated:

> In order to recover under section 10(b), a plaintiff must establish that the misrepresentation complained of caused the injury suffered. To establish causation, the plaintiff must show 'both *loss causation*—that the misrepresentations or omissions caused the economic harm—and *transaction causation*—that the violations in question caused the [plaintiff] to engage in the transaction in question.' *Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

*Id.* (emphasis in original).

### (1) *Transaction Causation*

■ Defendants argue that the complaint is inadequate because it fails to allege that they made any representation with respect to insurance prior to plaintiff's initial decision to purchase and that any alleged misrepresentations went not to the "investment purpose" of the Program or to inducing the purchase but merely to the mechanics of the sale. Defendants cite *Bosio v. Norbay Securities, Inc.,* 599 F.Supp. 1563 (E.D.N.Y.1985), as support for this argument, but *Bosio* is easily distinguishable for at least two reasons. First, in *Bosio,* the primary issue raised for 10b–5 purposes was whether the alleged fraud was "in connection with" the sale of securities, not whether there was transac-

tion causation. Second, in *Bosio,* plaintiff's claim was essentially one involving conversion, not securities fraud, and the alleged misrepresentation went merely to the mechanics of the sale and not to any inducement by defendants with respect to the investment purpose of the sale. By contrast, Connors alleges that the promised insurance was a strong inducement in getting him to purchase precious metals from IGBE and to continue participating in the Program. Specifically, he alleges that defendants' participation in the scheme enabled IGBE to succeed in attracting customers and that defendants knew that the promise of insurance was being used as an inducement.

In effect, plaintiff has presented a "but for" argument: "But for the insurance, I would not have purchased the 'security.'" This showing is sufficient. *See, e.g., Bennett,* 770 F.2d at 314; *Chemical Bank v. Arthur Andersen & Co.,* 726 F.2d 930, 943 n. 23 (2d Cir.), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984).

### (2) *Loss Causation*

■ Whether plaintiff has satisfied this prong of the causation requirement is more problematic, but the Court concludes that the complaint is adequate.

This requirement, as the Second Circuit has explained, "derives from the common law concept of 'proximate causation'" and "in effect requires that the damage complained of be one of the foreseeable consequences of the misrepresenation." *Manufacturers Hanover Trust Co. v. Drysdale Securities Corp.,* 801 F.2d 13, 20–21 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 952, 107 S.Ct. 952 (1987) (quotations omitted). Based on the reasoning and the analogousness of the facts in *Manufacturers* and *Marbury Management, Inc. v. Kohn,* 629 F.2d 705 (2d Cir.), *cert. denied,* 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980), the Court concludes that plaintiff has adequately alleged loss causation. As in those two cases, plaintiff has asserted that defendants' alleged misrepresentations induced him to participate in the Pro-

gram and that defendants knew that their misrepresentations were being relied upon. As in *Manufacturers* and *Marbury*, defendants' misrepresentations went to the *investment quality* of the Program, although they did not go to the *investment characteristic* of the Program. As the Second Circuit noted in another case, the effect of the misrepresentation in *Marbury* was as follows: "[i]n essence, the stock in question did not have the value represented by the 'broker.' Thus, because the misrepresentation ... both induced the purchase and related to the stock's value, it could be deemed causally related to the loss." *Bennett*, 770 F.2d at 314.[4]

Admittedly, the court in *Manufacturers* and *Marbury* emphasized the fact that the plaintiffs in each case had had grave misgivings about their investments and were induced to invest anyway by the misrepresentations of the defendants, but the absence of any specific allegation with respect to this factor does not change the conclusion that plaintiff has satisfied the loss causation requirement under the analysis set forth in *Manufacturers* and *Marbury*. Furthermore, the more stringent tests set forth in *Bennett*, 770 F.2d at 313–14; *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61–62 (2d Cir.1985); and *Chemical Bank*, 726 F.2d at 943–45, and relied upon by defendants, do not apply to the facts of this case.

### D. *Liability*

Plaintiff seeks to hold defendants liable under a number of theories: primary liability, secondary liability (aiding and abetting), and as to defendants Lexington and Southeastern, respondeat superior. Because plaintiff's complaint is sufficient with respect to aiding and abetting and respondeat superior liability, the Court will not reach the merits of plaintiff's other theory.

### (1) *Aiding and Abetting*

■ The elements necessary for aiding and abetting liability are well established in this circuit. Plaintiff must show

(1) a securities law violation by the primary wrongdoer; (2) knowledge of the purported violation on the part of the aider and abettor; and (3) conduct by the aider and abettor constituting substantial assistance in achieving the primary wrongdoer's fraud.

*In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, [Current] Fed. Sec.L.Rep. (CCH) ¶ 93,217, at 96,015 (S.D. N.Y.1987) (citing *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983)).

Although defendants argue that the Program was not a security and that plaintiff therefore has not established the first element, this Court has already decided that the complaint is adequate with respect to whether the Program was a security and, of course, IGBE is a primary wrongdoer.

The serious dispute between the parties with respect to aiding and abetting liability concerns the second element—scienter. The Second Circuit has determined that if an alleged aider and abettor owes a fiduciary duty to the plaintiff, recklessness is enough to satisfy the scienter requirement. *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983). However, absent a fiduciary duty, "the 'scienter' requirement scales upward—the assistance rendered must be knowing and substantial." *Id.* Thus, there must be some showing of intent to violate the securities laws or knowledge of such violation. *See, e.g., In re Gas Reclamation, supra*, 659 F.Supp. 493, [Current] Fed.Sec.L.Rep. (CCH) at 91,016. Notwithstanding defendants' assertions, this Court finds that plaintiff's allegations of reckless-

---

**4.** The Court agrees with the following interesting footnote from the *Marbury* opinion:

The majority opinion neither refuses to give effect to the traditional and acknowledged standard of causation, nor does it repudiate it, or refuse to abide by it. Differentiating transaction causation from loss causation can be a helpful analytical procedure only so long as it does not become a new rule effectively limit-

ing recovery for fraudulently induced securities transactions to instances of fraudulent representations about the value characteristics of the securities dealt in. So concise a theory of liability for fraud would be *too accommodative of many common types of fraud, such as the misrepresentation of a collateral fact that induces a transaction.* 629 F.2d at 710 n. 3 (emphasis added).

ness combined with his allegations that defendants "knew" of the scheme and of the purpose for which the Certificates of Insurance were being used and "knew" of plaintiff's reliance on the promised insurance coverage are sufficient to establish scienter at this stage of the proceedings. *Cf. id.*

Finally, with respect to the element of substantial assistance, plaintiff has complied with the Second Circuit's mandate that "the complaint ... allege that the acts of the aider and abettor proximately caused the harm to the [plaintiff] on which the primary liability is predicated." *Bloor,* 754 F.2d at 62 (footnote omitted). Defendants contend that the complaint charges them, at most, with inactivity or passive approval of the scheme, rather than active assistance of IGBE. For two reasons, the argument must fail. First, as plaintiff argues, the Second Circuit has determined that "[i]naction on the part of the alleged aider and abettor ordinarily should not be treated as substantial assistance, *except* when it was designed intentionally to aid the primary fraud." *Armstrong,* 699 F.2d at 91 (emphasis added). Plaintiff's allegations fall within this exception. Second, plaintiff is not seeking to impose liability on the basis of the "unremarkable" act of providing insurance, but rather on the basis that defendants knowingly aided a fraudulant scheme; specifically, defendants provided "sham" insurance and knowingly provided certificates that were misleading to induce plaintiff's investment. Plaintiff's allegations of active and knowing wrongdoing are sufficient to withstand defendants' motion. *Cf. In re Gas Reclamation, supra,* 659 F.Supp. 493, [Current] Fed.Sec.L.Rep. (CCH) at 96,016.

#### (2) *Respondeat Superior*

■■ Defendants Southeastern and Lexington move to dismiss plaintiff's claim that they are liable on the basis of respondeat superior for violating section 10(b) and rule 10b–5. Defendants' view of the case law on this theory is far too narrow, particularly with respect to decisions in this circuit and with respect to the relationship between respondeat superior liability and scienter requirements for 10b–5 liability as enunciated in *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), and *Aaron v. SEC,* 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). First, as to the issue of scienter, the court in *Northwestern National Bank v. Fox & Co.,* 102 F.R.D. 507, 512 (S.D.N.Y.1984), explained that the Supreme Court in *Aaron* "merely held that scienter is an essential element of a 10b–5 violation in an injunctive action by the SEC, as well as in a private damages action," and that an injunction could therefore not be upheld on the basis of a management employee's *negligent* supervision of two broker-employees. The key to *Aaron* was the SEC's attempt to impose *primary* liability, not on an employer, but on an employee who merely supervised other employees. The Court ruled that scienter is required in such an instance. *See id.* (construing *Aaron*); *Sharp v. Coopers & Lybrand,* 649 F.2d 175, 183 (3d Cir.1981) (same), *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982); *see also In re Atlantic Financial Management, Inc.,* 784 F.2d 29, 31 (1st Cir.1986) (distinguishing *Ernst & Ernst* as a case restricting primary liability to persons who act with scienter from *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 568, 102 S.Ct. 1935, 1943, 72 L.Ed.2d 330 (1982), in which Court approvingly cited cases upholding vicarious liability upon corporations employing those who knowingly or recklessly make misrepresentations), *cert. denied,* —— U.S. ——, 107 S.Ct. 2469, 95 L.Ed.2d 877 (1987). Thus, there is no "tension," as defendants characterize it, when a plaintiff seeks to impose secondary liability on an employer or principal. Furthermore, as the court in *Northwestern Bank* noted, in the context of respondeat superior, the *agent* must act with scienter and the agent's conduct is then imputed to the employer. 102 F.R.D. at 512 (citations omitted). This concept was recognized, at least implicitly, by the Second Circuit in *Marbury,* 629 F.2d at 711–16.

Defendants' second argument—that the Second Circuit has carved out only a very narrow exception to the scienter require-

ments under rule 10b–5 and has limited the applicability of the doctrine of respondeat superior to employers such as broker-dealers and accountants who have special duties under the securities laws—is not persuasive. Defendants' reading of *Marbury* and *Northwestern Bank* is too restrictive. While the court in *Marbury* had before it a broker trainee and his employer, the court did not indicate that its reasoning was limited to such situations. Indeed, the court emphasized, albeit in a different context, that with respect to respondeat superior principles, "the concern is simply with scope or course of employment and whether the acts of the employee ... can fairly be considered to be within the scope of his employment." 629 F.2d at 716 (citing Restatement (Second) of Agency §§ 228, 229, 257, 258, 261, 262, 265). Significantly, in distinguishing respondeat superior liability under section 10(b) from "controlling person" liability under section 20(a) of the Securities Act of 1934, 15 U.S.C. § 78t(a), the court noted that section 28(a) of the 1934 Act, 15 U.S.C. § 78bb, "specifically enacts that the rights and remedies provided by the '34 Act shall be in addition to any and all rights and remedies that may exist at law or in equity." *Id.*

Finally, defendants' arguments that plaintiff has not alleged sufficient facts to conclude that Emery, Putvin, and Gassie were their agents or were acting within the scope of their employment are premature. These arguments raise factual questions that cannot be resolved on a motion to dismiss. *See Armstrong*, 699 F.2d at 92; *Zaro v. Mason*, 658 F.Supp. 222, 228 (S.D. N.Y.1987); *cf. Marbury*, 629 F.2d at 716.

Defendants' motion to dismiss with respect to respondeat superior liability is denied.

### E. *Alleged Rule 9(b) Deficiencies*

██ Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other conditions of mind of a person may be averred generally." Fed. R.Civ.P. 9(b). The Second Circuit has de-

termined that to meet the requirements of rule 9(b), the allegations in the complaint should specify the time, place, speaker, and content of the alleged fraudulent statements or misrepresentations. *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir.1986); *accord DiVittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987); *see generally U.S. v. Rivieccio*, 661 F.Supp. 281, 289–91 (E.D.N.Y.1987) (discussing requirements and collecting cases). Furthermore, "[w]here multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud." *DiVittorio, supra*, at 1247 (citing *Natowitz v. Mehlman*, 542 F.Supp. 674, 676 (S.D.N.Y.1982)).

While plaintiff's complaint is not a model with respect to the detail provided, it is sufficient. It provides approximate times, as well as places, speakers, and content. It alleges that statements or omissions of material fact made by Emery are attributable to Lexington and Southeastern under the doctrine of respondeat superior, thus satisfying the requirement that multiple defendants be apprised of the nature of their participation.

## IV. THE RICO COUNT

Plaintiff asserts in the third count of his complaint that he has been injured by defendants' alleged violations of sections 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968. Defendants have moved to dismiss these claims pursuant to rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. Each of defendants' arguments in support of their motion will be addressed separately.

### A. *Distinction Between "Person" and Enterprise"*

Plaintiff alleges that defendants have violated subsections (c) and (d) of 18 U.S.C. § 1962, which provide that:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign com-

merce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section.

18 U.S.C. § 1962(c), (d). For RICO purposes, the term "person" is defined as "any individual or entity capable of holding a legal or beneficial interest in property," *id.* § 1961(3), and the term "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," *id.* § 1961(4). Plaintiff has not specifically used the term "person" in his RICO claims, but he has alleged that "[t]he enterprises within the meaning of 18 U.S.C. § 1961(4) are Lexington, Emery, Southeastern, the individual defendants, and IGBE, and the association in fact was comprised of these entities." Complaint ¶ 42.

■■■ Defendants argue that plaintiff's complaint suffers from a fatal flaw—that is, that the defendants have been characterized as both "enterprises" and, at least implicitly, as "persons."[5] Defendants assert that to satisfy the requirements of a RICO claim pursuant to section 1962, plaintiff's complaint must show that the "person" and the "enterprise" are distinct entities.

In *Bennett,* 770 F.2d at 315, the Second Circuit held that a single corporate entity could not, as a matter of law, simultaneously be both the "person" and the "enterprise" under section 1962(c). In a very recent decision, however, the Second Circuit has distinguished *Bennett* in the context of a single entity being both the "person" and *one* of a *number* of entities comprising the "enterprise." *See Cullen v. Margiotta,* 811 F.2d 698, 729–30 (2d Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987); *see also Fustok v.*

*Conticommodity Services, Inc.,* 618 F.Supp. 1074, 1075–76 (S.D.N.Y.1985). In finding that a single entity can be both, the court in *Cullen* reasoned that:

[t]he definitions of both terms are intentionally broad. *See, e.g.,* H.R.Rep. No. 1549, 91st Cong., 2d Sess. 56 (1970), *reprinted in* 1970 [U.S.Code Cong. & Admin.News] 4007, 4032. The term " 'person' includes any individual or entity capable of holding a legal or beneficial interest in property," 18 U.S.C. § 1961(3); and " 'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity," *id.* § 1961(4). In consequence, "infiltration of any associative group by any individual or group capable of holding a property interest can be reached." H.R.Rep. No. 1549, at 56, *reprinted in* 1970 [U.S.Code Cong. & Admin.News] at 4032. Indeed, the very terms of § 1962(c) appear to envision that the same entity may be both the RICO "person" and a member of the "enterprise," for the section speaks of a "person ... associated with any enterprise." Thus, although we rejected in *Bennett* the notion that an entity may be deemed "associated with" only itself, there is neither a conceptual nor a doctrinal difficulty in positing an entity associated with a group of which it is but a part.

811 F.2d at 730.

Based on the analysis set forth in *Cullen,* it is clear that defendants can be both RICO "persons" and members of a group comprising the RICO "enterprise." Therefore, defendants' argument with respect to this issue is unavailing.

Plaintiff's complaint, however, suffers from two other deficiencies. First, it is not clear whether plaintiff is alleging that there are several enterprises, as a literal reading of paragraph 42 of the complaint would indicate, or one enterprise comprised of all the defendants and IGBE. Second, it

---

**5.** In separate paragraphs in his complaint, plaintiff has alleged that one "defendant" violated section 1962(c) and that "defendants" violated section 1962(d). He has not identified which defendants he is referring to in these paragraphs. *See* discussion *infra.*

is not clear whether plaintiff is alleging that one defendant is the "person" or whether each defendant is a "person" within the meaning of section 1962(c). A liberal construction of the complaint in the light most favorable to the plaintiff supports a reading by the Court of that complaint as alleging that there is *one* "association in fact" enterprise comprised of "Lexington, Emery, and individual defendants, and IGBE." [6] Such a construction also supports a reading of the complaint as alleging that *each* of the defendants is a "person" and that *each* conducted or participated in the conduct of the affairs of one enterprise through a pattern of racketeering activity in violation of section 1962(c).[7]

Finally, defendants Lexington and Southeastern argue that plaintiff must specifically allege who the RICO "person" is. *See* Defendant Lexington's Memorandum at 45 n. 15. Plaintiff's failure to use the term "person" is not fatal, however. *Cf. Bennett*, 770 F.2d at 315 n. 2 ("The complaint does not name the 'person' who conducted the affairs of [the 'enterprise'] in the proscribed manner. However, because U.S. Trust is named as the defendant, we interpret the complaint to name U.S. Trust as the section 1962(c) 'person' "); *Richter v. Sudman*, 634 F.Supp. 234, 240 (S.D.N.Y. 1986) ("Since they are being sued, the named defendants are considered the RICO 'persons'...").

Based on these assumptions, plaintiff's complaint is sufficient. Any technical deficiencies can be corrected by the transferee court.

**B. *Pattern of Racketeering Activity***

As mentioned above, RICO prohibits "any person ... associated with any enterprise" from conducting "such enterprise's affairs *through a pattern of racketeering activity*," 18 U.S.C. § 1962(c) (emphasis added), or from conspiring to do so, *id.* § 1962(d). The phrase "pattern of racketeering activity" is defined as requiring "at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years ... after the commission of a prior act of racketeering activity." *Id.* § 1961(5). Section 1961(1) of the statute sets forth a number of predicate acts that are characterized as "racketeering activity."

In alleging that defendants engaged in a pattern of racketeering activity, plaintiff asserts that defendants committed three predicate acts as enumerated in the statute defining racketeering activity—that is, securities fraud, *id.* § 1961(1)(D); mail fraud, *id.* § 1961(1)(B); and wire fraud, *id. See* Complaint ¶ 43. Defendants have moved to dismiss on two grounds: first, that plaintiff has failed to allege adequately two predicate acts and second, that plaintiff has failed to allege adequately a pattern.

**(1) *Predicate Acts***

For the reasons set forth below, the Court finds that plaintiff has adequately alleged at least two predicate acts.

**(a) *Securities Fraud***

The Court has already determined that plaintiff has sufficiently alleged that de-

---

**6.** As mentioned above, paragraph 42 of plaintiff's complaint refers to "enterprises"; but, based on a reading of plaintiff's entire complaint, it would appear that plaintiff's phrasing is merely inartful and not intentional. In his memorandum in opposition to defendants' motions, plaintiff implicitly argues in favor of the Court's assumption that there is one enterprise. *See* Plaintiff's Memorandum at 61 n.* Furthermore, plaintiff argues that the facts support this interpretation or, alternatively, an interpretation that "the Lexington defendants were *'persons'* who were associated among themselves to further and help IGBE to accomplish its own racketeering enterprise." *Id.* at 52 n.* *Cf. Foster Medical Corp. Employees' Pension Plan v.*

*Healthco, Inc.*, 753 F.2d 194, 197 (1st Cir.1985) (issue raised implicitly in complaint may be gleaned from reading of allegations in conjunction with plaintiffs' opposition to defendants' motion for summary judgment).

**7.** This assumption appears reasonable based on plaintiff's use of the plural term "defendants" throughout the counts in the complaint, *see* Complaint ¶¶ 36, 37, 39, 43, 45, and 46, and based on a logical reading of the complaint. Either of plaintiff's arguments in opposition to defendants' motions would also support this interpretation. *See* Plaintiff's Memorandum at 61 n.*; note 6 *supra.*

fendants were engaged in "fraud in the sale of securities." *See* discussion *supra.*

### (b) *Mail and Wire Fraud*

Under section 1961(1)(B), "racketeering activity" includes "any act which is indictable" under 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud). The elements of an indictable offense under both the mail and wire fraud statutes [8] are: (1) participation in a scheme to defraud and (2) knowing use of the interstate mails or interstate wires to further the scheme. *See, e.g., United States v. Gelb,* 700 F.2d 875, 879 (2d Cir.), *cert. denied,* 464 U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152 (1983). In addition, "[p]roof of a fraudulent scheme requires evidence showing a specific intent to defraud." *Id.*

Defendants argue that plaintiff has not alleged these elements adequately; specifically, defendants assert that plaintiff's complaint should be dismissed for failure to comply with the requirements of rule 9(b).

Rule 9(b) applies to allegations of mail and wire fraud as predicate acts under RICO. *See, e.g., Equitable Life Assurance Society v. Alexander Grant & Co.,* 627 F.Supp. 1023, 1028 (S.D.N.Y.1985) (citations omitted); *Rich-Taubman Associates v. Stamford Restaurant Operating Co., Inc.,* 587 F.Supp. 875, 878 (S.D.N.Y.1984) (citation omitted); *cf. Moss v. Morgan Stanley, Inc.,* 719 F.2d 5, 19 (2d Cir.1983), *cert. denied,* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). As mentioned above, courts in this circuit have generally held that under 9(b), the time, place, and content of the alleged misrepresentations, as well as the speaker, must be identified. *See, e.g., Luce,* 802 F.2d at 54 (citations omitted).[9]

With respect to the allegations of mail fraud, plaintiff's complaint satisfies the particularity requirements of rule 9(b). Specifically, plaintiff has described where and how the alleged scheme occurred, given the approximate dates of his transactions with IGBE and thus, by inference, the approximate dates of mailings, and identified the alleged misrepresentations and omissions, as well as the "speakers." It is not necessary for plaintiff to provide more detail at this stage of the proceedings.[10]

---

**8.** The mail fraud and wire fraud statutes have been "identically construed." *United States v. Siegel,* 717 F.2d 9, 14 (2d Cir.1983) (citations omitted); *accord United States v. Standard Drywall Corp.,* 617 F.Supp. 1283, 1291 n. 3 (E.D.N.Y.1985) (citations omitted).

**9.** *In Conan Properties, Inc. v. Mattel, Inc.,* 619 F.Supp. 1167 (S.D.N.Y.1985), Judge Duffy refined these requirements in the RICO context by determining that rule 9(b) is satisfied if the complaint specifies:

(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) the same, (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants 'obtained as a consequence of the fraud.'

*Id.* at 1172 (quoting *Todd v. Oppenheimer & Co., Inc.,* 78 F.R.D. 415, 420–21 (S.D.N.Y.1978)).

**10.** Defendants rely on *River Plate Reinsurance Co., Ltd. v. Jay-Mar Group, Ltd.,* 588 F.Supp. 23 (S.D.N.Y.1984), in their argument that plaintiff must specify the time, place, and content of each mail communication. *See, e.g.,* Defendant Lexington's Reply Memorandum at 45. *River Plate* is clearly distinguishable, however. In that case, the allegations in the complaint were overbroad and vague and failed to provide enough information for the defendant to be able to defend against them. *See River Plate,* 588 F.Supp. at 26. Here, plaintiff's allegations are set forth with sufficient specificity for defendants to respond. While it might have been helpful for plaintiff to provide specific dates, his failure to do so is not fatal given his detailed allegations as to the nature and mechanics of the alleged scheme. *See, e.g., Beth Israel Medical Center v. Smith,* 576 F.Supp. 1061, 1071 (S.D.N.Y.1983) ("In view of the complaint's detailed description of the defendants' scheme, ... the failure to describe particular letters or telephone calls is not fatal to the complaint.")

Defendants also rely on *River Plate* to argue that plaintiff's RICO claim should be dismissed for failure to plead adequately the fraudulent scheme underlying the allegations of mail fraud. *See, e.g.,* Defendant Lexington's Memorandum at 49. In this context, however, *River Plate* is inapposite. In *River Plate,* the court noted that the plaintiff had "attempted to cast [the defendant's] alleged wrongdoing in terms of a RICO violation by referring to the earlier allegations of common-law fraud and then asserting that defendants furthered their fraudulent scheme by causing documents to be sent through the United States mails and by misusing interstate communication facilities." 588

As one court has noted, rule 9(b) is satisfied if enough information is given to allow the defendants to frame a responsive pleading and to assure the court that a sufficient basis exists for the allegations made. *Rich-Taubman*, 587 F.Supp. at 880 (citations omitted).[11]

Plaintiff has also pleaded adequately the element of intent with respect to the requirements of rule 9(b), which permits intent to be averred generally. The Second Circuit has determined that rule 9(b) is satisfied when a plaintiff provides some factual basis giving rise to a strong inference that the defendant had an intent to defraud. *See, e.g., Connecticut National Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987) (examining scienter requirements under rule 9(b) in Williams Act context); *accord Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 49–51 (2d Cir.1987) (examining scienter requirements under rule 9(b) in RICO context). The Second Circuit has also noted that "[a] common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so." *Id.* at 50 (citation omitted). Construing the complaint liberally, the Court finds that plaintiff's factual allegations logically lead to the conclusion that defendants' motives were to aid IGBE in its scheme so that defendants' income would be increased. Plaintiff has

clearly alleged facts showing defendants' opportunity to do so. Plaintiff's allegations thus satisfy the requirements of rule 9(b).

With respect to the number of acts of mail fraud, plaintiff has set forth enough detail to find that there are at least two. Plaintiff alleges that he made two purchases or "entrustments." Each of these transactions involved his mailing of a check or metals to IGBE and IGBE's mailing of specified documents to him.[12] *See* Complaint ¶ 24.

■■■ Defendants argue that plaintiff's allegations attributing the actual use of the mails to plaintiff or to IGBE and not to defendants is a fatal deficiency under the wire fraud statute. This argument is without merit. It is well established that liability under section 1341 does not require a finding that a defendant directly or personally performed the mailing; it is sufficient to find that the defendant "caused" the mailing or that the mailing was reasonably foreseeable in the execution of or as a consequence of the alleged scheme to defraud. *See, e.g., United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir.1986) (citing *Pereira v. United States*, 347 U.S. 1, 8–9, 74 S.Ct. 358, 362–363, 98 L.Ed. 435 (1954); *United States v. Muni*, 668 F.2d 87 (2d Cir.1981)), *cert. granted*, —— U.S. ——, 107 S.Ct. 666, 93 L.Ed.2d 718 (1986). In the

---

F.Supp. at 26–27. The real problem with the complaint appeared to be the plaintiff's failure even to allege the existence of an enterprise or to track the appropriate RICO statutorily language, in addition to the failure to plead adequately the underlying scheme. *Id.* at 27. Connors' complaint does not suffer the same deficiencies as those apparently suffered by the complaint in *River Plate*.

Furthermore, in light of the Supreme Court's general admonition that a liberal reading is required by this remedial statute, *see Sedima, S.P.R.L. v. Imrex Cc., Inc.*, 473 U.S. 479, 497–98, 105 S.Ct. 3275, 3286, 87 L.Ed.2d 346 (1985), this Court declines to require a stringent, mechanical application of rule 9(b) to a RICO pleading when the pleading, in essence, provides the necessary particularity.

**11.** Plaintiff makes a similar argument in his opposition to defendants' motions, citing *Systems Research, Inc. v. Random, Inc.*, 614 F.Supp. 494 (N.D.Ill.1985). *See* Plaintiff's Memorandum

at 67. Defendants Lexington and Southeastern attempt to distinguish this case by noting that it was decided in another circuit and that its determination with respect to rule 9(b) does not comport with the stricter pleading requirements in the Second Circuit. *See* Defendant Lexington's Reply Memorandum at 46 n. 35. This Court disagrees with defendants' argument and notes that the court in *Rich-Taubman*, cited above, reached the same conclusion before the decision in *Systems Research*. Furthermore, at least one court in this circuit has cited *Systems Research* with approval on this issue. *See Conan Properties*, 619 F.Supp. at 1173.

**12.** Under the mail fraud statute, each separate mailing can constitute an offense, even if there is only one scheme to defraud. *United States v. Beatty*, 587 F.Supp. 1325 (E.D.N.Y.1984). At this stage of the proceedings, it is unnecessary to determine whether the two mailings by plaintiff constitute additional offenses for which the defendants may be liable.

scheme alleged by plaintiff, it was certainly foreseeable that the mails would be used to forward the Certificates of Insurance and other documents.

Because the Court concludes that plaintiff has alleged adequately at least two predicate acts constituting securities fraud and mail fraud, it is unnecessary to reach the merits of defendants' motion to dismiss with respect to the predicate act(s) of wire fraud.

### (2) *Pattern*

 Defendants Lexington and Southeastern argue that plaintiff has failed to allege "the *'pattern* of racketeering activity' elements necessary to state a RICO claim." Defendant Lexington's Reply Memorandum at 46 (emphasis added). Specifically, defendants argue that multiple acts performed in furtherance of a single scheme cannot be deemed a pattern. *Id.* at 46–48.

In *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 n. 14, 105 S.Ct. 3275, 3285 n. 14, 87 L.Ed.2d 346 (1985), the Supreme Court, in dictum, determined "that while two acts are necessary, they may not be sufficient" to constitute a "pattern" within the meaning of section 1961(5). The Court emphasized that isolated acts cannot constitute a pattern; rather, there must be a combination of relationship and continuity between separate acts. *Id.* The Court did not, however, resolve the question of whether multiple acts performed in furtherance of a single scheme can constitute a pattern; indeed, the language of the *Sedima* footnote has resulted in widely divergent views on this question. *See generally Morris v. Gilbert,* 649 F.Supp. 1491, 1501–03 (E.D.N.Y.1986) (reviewing cases spawned by *Sedima* decision).

This issue was addressed quite recently by the Second Circuit in *United States v. Ianniello,* 808 F.2d 184 (2d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3230, 97 L.Ed.2d 736 (1987). In *Ianniello,* the court determined that multiple schemes or "episodes" are not required by the dictum in *Sedima* or by the statutory language of RICO; rather, multiple acts in furtherance

of a single scheme may constitute a "pattern" under section 1962(c). *Id.* at 191–93 & 192 n. 15. The court in *Ianniello* specifically held that "when a person commits at least two acts that have the common purpose of furthering a continuing criminal enterprise with which that person is associated, the elements of relatedness and continuity which the *Sedima* footnote construes section 1961(c) to include are satisfied." *Id.* at 192.

Cases decided in this circuit since *Ianniello* have not been consistent, with some courts distinguishing the pattern requirement on the basis of whether an action is civil or criminal. *Compare Franklin & Joseph, Inc. v. Continental Health Industries, Inc.,* 664 F.Supp. 719 (S.D.N.Y.1987) (adopting restrictive interpretation of pattern requirement in civil RICO action and determining that footnote 15 of *Ianniello* opinion is dictum) *with Shamley v. ITT Corp.,* No. 85 Civ. 1703 (S.D.N.Y. Apr. 9, 1987) [Available on WESTLAW, DCT database] (LEXIS, Genfed library, Dist file) (relying on *Ianniello* and adopting less restrictive interpretation of pattern requirement in civil RICO action). This split was resolved by the Second Circuit's most recent opinion on the subject. In *Beck,* a civil RICO case, the court noted that after *Ianniello,* multiple episodes are not necessary; rather, "*Ianniello* confirms that two related predicate acts will suffice to establish a pattern under 18 U.S.C. § 1961(5)." 820 F.2d at 51 (citing *Ianniello,* 808 F.2d at 189–90).

Plaintiff has alleged adequately at least two acts that are related and continuous under the standard set forth in *Sedima, Ianniello,* and *Beck.* Specifically, plaintiff's complaint can be construed as alleging that the "enterprise" was a continuing operation and that the predicate acts related to a common purpose—a single, continuing scheme to defraud. *See Ianniello,* 808 F.2d at 189–93. Accordingly, defendants' motion with respect to this issue is denied.

### C. *Liability of Each Defendant*

The Court has already determined that with respect to the alleged securities fraud,

plaintiff's complaint is sufficient in terms of aiding and abetting liability and in terms of Lexington's and Southeastern's respondeat superior liability. The Court similarly concludes that the complaint is sufficient with respect to aiding and abetting and respondeat superior liability under RICO and with respect to defendants' rule 9(b) arguments.

■ With respect to the issue of respondeat superior liability in the RICO context, the Court is persuaded that such liability in this factual setting is appropriate, notwithstanding the split of authority on the subject. The reasoning in *Bernstein v. IDT Corp.*, 582 F.Supp. 1079, 1083–84 (D.Del.1984), is particularly cogent, even though the factual setting in that case was easily distinguishable. The court in *Bernstein* noted that "[w]hen conduct is proscribed by a federal statute and civil liability for that conduct is explicitly or implicitly imposed, the normal rules of agency law apply in the absence of some indication that Congress had a contrary intent." *Id.* 1083. Relying in part on the Supreme Court's pronouncement in *American Society of Mechanical Engineers, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982), that a corporation can be liable for treble damages under agency principles in the antitrust context, the court in *Bernstein* concluded that respondeat superior liability in the RICO context is appropriate. The court emphasized that it "perceive[d] nothing in RICO or its legislative history which would suggest that the normal rules of agency law should not apply to the civil liability created by that statute" and, indeed, concluded "that application of the doctrines of apparent authority and *respondeat superior* will, at least, in most instances, further the statutory goals." *Id.* at 1083–84. Several other courts have reached the same conclusion. *See, e.g., Tryco Trucking Co., Inc. v. Belk Stores Services, Inc.*, 634 F.Supp. 1327, 1334 (W.D.N.C.1986); *Morley v. Cohen*, 610 F.Supp. 798, 811 (D.Md.1985). This Court is not persuaded by the reasoning of those courts reaching a contrary result, *see, e.g., Schofield v. First Commodity Corp. of Boston*, 793 F.2d 28 (1st Cir.1986);

*see also Luthi v. Tonka Corp.*, 815 F.2d 1229 (8th Cir.1987), and notes that many have reached a contrary conclusion in the context of such conceptually distinguishable problems as whether a corporation that is the RICO "enterprise" can be vicariously liable under section 1962(c) for the acts of an employee who is the RICO "person," *see, e.g., Rush v. Oppenheimer*, 628 F.Supp. 1188 (S.D.N.Y.1985); *Dakis ex rel. Dakis Pension Plan v. Chapman*, 574 F.Supp. 757 (N.D.Cal.1983).

Finally, it should be noted that in *Petro-Tech, Inc. v. Western Company of North America*, 824 F.2d 1349 (3rd Cir.1987), the court made the following observation:

"Unless the employer is the § 1962(c) enterprise at the same time as its employees are the § 1962(c) persons, however, vicarious liability may be appropriate."

The court also stated that § 1962(c) liability may be appropriate so long as the employer/enterprise actually benefited from the persons' predicate acts. That observation is apposite here.

Because plaintiff's complaint is sufficient with respect to aiding and abetting and respondeat superior liability, the Court finds it unnecessary to address defendants' other arguments on this issue.

## V. OTHER ISSUES RAISED IN DEFENDANTS' MOTIONS TO DISMISS

Because the Court concludes that plaintiff's complaint can withstand defendants' motions to dismiss based on the reasons set forth above, it finds it unnecessary to discuss the other issues raised by the parties.

## VI. MOTION TO TRANSFER

Plaintiff moves pursuant to 28 U.S.C. § 1404(a) to transfer this action to the Southern District of Florida, in which another action involving the same purported class, identical defendants, with the addition of several other defendants, and virtually identical issues is pending. The Florida action was commenced in October 1986, and the Florida court has already denied what have been described as virtually iden-

454

tical motions to dismiss by the same defendants. The attorneys representing the plaintiffs in both actions have indicated a desire to consolidate the actions.

Plaintiff argues that a transfer is warranted because Florida, not New York, has the closest nexus to the claims asserted and the convenience of the parties and witnesses and the interest of justice support a transfer. In opposition, defendants argue that plaintiff has failed to make the required showing under section 1404(a), that the motion is premature, and that judicial economy and fairness to the litigants require a denial of the motion. For the reasons set forth below, plaintiff's motion is granted.

A. *General Principles*

The change of venue statute, 28 U.S.C. § 1404(a), provides:

> For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

■ The burden is on the moving party to show that there should be a change of forum. *Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215, 218 (2d Cir.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979). The showing must be "clear-cut" that "the balance of conveniences and the interests of justice favor a trial in the proposed transferee forum." *St. Cyr v. Greyhound Lines, Inc.*, 486 F.Supp. 724, 727 (E.D.N.Y.1980).

Various factors looked at by courts in this circuit are: "(1) convenience of the parties; (2) convenience of material witnesses; (3) availability of process to compel the presence of unwilling witnesses; (4) the cost of obtaining the presence of witnesses; (5) the relative ease of access to sources of proof; (6) calendar congestion; (7) where the events in issue took place; and (8) the interests of justice in general," *Kreisner v. Hilton Hotel Corp.*, 468 F.Supp. 176, 177 (E.D.N.Y.1979); (9) "the practical problems indicating where the case can be tried more expeditiously and inexpensively," *Designs by Glory, Ltd. v. Manhattan Creative Jew-*

*elers, Inc.*, 657 F.Supp. 1257, 1259 (S.D.N. Y.1987) (citing *Schneider v. Sears*, 265 F.Supp. 257, 263 (S.D.N.Y.1967)); and (10) the plaintiff's choice of forum. *See generally* 15 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* §§ 3847–3854 (2d ed. 1986).

None of these factors standing alone is dispositive. Even the plaintiff's choice of forum, which is generally given great deference, carries less weight in certain situations such as when a plaintiff seeks to represent a widely dispersed class. *See, e.g., Somerville v. Major Exploration, Inc.*, 576 F.Supp. 902, 908 (S.D.N.Y.1983) (citation omitted).

■ Under the interests of justice factor, a frequently mentioned element is the "[s]trong policy favoring the litigation of related claims in the same tribunal" so that (1) pretrial discovery can be conducted more efficiently, (2) duplicitous litigation can be avoided, thus saving time and expense for the parties and witnesses and better serving the public interest, and (3) inconsistent results can be avoided. *Wyndham Associates v. Bintliff*, 398 F.2d 614, 619 (2d Cir.), *cert. denied*, 393 U.S. 977, 89 S.Ct. 444, 21 L.Ed.2d 438 (1968); *accord National Union Fire Insurance Co. v. DDJM Partnership*, No. 86 Civ. 7636 (S.D.N.Y. Apr. 8, 1987) [Available on WESTLAW, DCT database] (LEXIS, Genfed library, Dist file). The Supreme Court has emphasized this policy a number of times. *See, e.g., Kerotest Manufacturing Co. v. C–O–Two Fire Equipment Co.*, 342 U.S. 180, 183, 72 S.Ct. 219, 221, 96 L.Ed. 200 (1952) (the test is "[w]ise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation").

The Second Circuit has refined this policy in a rule providing that if essentially the same lawsuit and same parties are involved, "the first suit should have priority, 'absent the showing of balance of convenience in favor of the second action' ... or unless there are special circumstances which justify giving priority to the second." *Factors Etc., Inc.*, 579 F.2d at 218 (quoting *William Gluckin & Co. v. International*

*Playtex Corp.*, 407 F.2d 177, 178 (2d Cir. 1969) (quoting *Remington Products Corp. v. American Aerovap, Inc.*, 192 F.2d 872 (2d Cir.1951))). The general rule of deference to the first-filed suit, however, is not a rigid, mechanical one. It has certain well-established exceptions such as when "the first filed action has not reached a more advanced stage than its counterpart." *Dow Jones & Co., Inc. v. Board of Trade*, 539 F.Supp. 190, 193 (S.D.N.Y.1982) (citation omitted). As expressed by one court, "[u]nless there are compelling reasons otherwise, there is no justification for separate trials in separate districts." *Teleprompter Corp. v. Polinsky*, 447 F.Supp. 53, 56 (S.D.N.Y.1977) (quoting *Faigenbaum Machinery, Inc. v. Scott & Williams, Inc.*, 344 F.Supp. 1267, 1271 (S.D.N.Y.1972)). Thus, related litigation is a persuasive, although not dispositive, factor in favor of transfer. *See generally* 15 C. Wright & A. Miller, *supra*, § 3854.

B. *Application of These Principles*

▆ Plaintiff has met his burden of showing that a change of venue to the Southern District of Florida is clearly warranted for the convenience of parties and witnesses and in the interest of justice. First, two of the parties—Emery and Gassie—are residents of Florida and a third—Putvin—was a resident of Florida at the time of the alleged transactions. As far as Southeastern is concerned, its location in Atlanta makes Florida at least as convenient as New York, if not more so. Lexington, which is located in Boston, has not alleged that it would be inconvenienced by having to litigate in Florida.

Second, most of the class members reside in Florida. Third, an overwhelming percentage of relevant documents appear to be located in Florida where Emery and IGBE conducted their business at the time of the alleged transactions. Moreover, the importance of this factor is enhanced by the fact that one of the named plaintiffs in the Florida action, Earl Faircloth, is or has been the Trustee in Bankruptcy for IBGE and has in his possession in Fort Lauderdale all of the IGBE files.

Fourth, it has been alleged that most of the key witnesses are in Florida. Unfortunately, plaintiff has not identified these witnesses with any specificity. However, as plaintiff correctly notes, a specific showing is required only when the movant seeks a transfer *solely* "on account of the convenience of witnesses." *Factors, Etc.*, 579 F.2d at 218. Because plaintiff seeks a transfer "on account of" several factors, his failure to specify key witnesses and their testimony is not fatal. The Court assumes, in any case, that many key witnesses are located in Florida, given IGBE's and Emery's location there.

A fifth factor in favor of transfer is that Florida has a much closer nexus to the transactions at issue than does New York. Defendants Emery, Gassie, and Putvin concede as much, even though they choose to characterize this factor as having only a "certain superficial appeal." Boyar Affirmation in Opposition to Transfer ¶ 6.

While the above factors are important, the crucial factor in this case is that a transfer would clearly serve the interests of justice, while a denial would lead to a waste of judicial resources and would cause unnecessary expenses to all concerned. The pendency of related litigation, as discussed above, is well recognized as a very important factor in deciding a transfer motion. In this instance, the Florida action involves the same issues, the same allegedly fraudulent transactions, the same defendants as in *Connors* as well as additional defendants, and the same proposed class. Having two such actions proceeding at the same time, involving duplicative discovery and motion practice, would serve no purpose and might lead ultimately to inconsistent results, a possibility that is heavily frowned upon by the courts. *See, e.g., Wyndham*, 398 F.2d at 619–20; *Air Express International Corp. v. Consolidated Freightways, Inc.*, 586 F.Supp. 889, 892–93 (D.Conn.1984).

The Court has carefully considered defendants' arguments in opposition to transfer and finds them unpersuasive. For the reasons set forth above, plaintiff's motion is granted.

## C. *Pending Motions*

■■■ Currently before the Court is plaintiff's motion for class certification. There is ample authority for the proposition that such motions should be decided by the transferee court, which is ultimately responsible for the litigation. *See, e.g., Telman v. Capt. Crab, Inc.,* No. 86–C–6584 (N.D.Ill. December 3, 1986) [Available on WESTLAW, DCT database] (LEXIS, Genfed library, Dist file); *Weiss v. Rizzoli International Publications, Inc.,* 616 F.Supp. 837, 842 (N.D.Ill.1985); *Midwest Precision Services, Inc. v. PTM Industries Corp.,* 574 F.Supp. 657, 658 (N.D.Ill.1983); *Foster v. Litton Industries, Inc.,* 431 F.Supp. 86, 88 (S.D.N.Y.1977); *McCrystal v. Barnwell County,* 422 F.Supp. 219, 225–26 (S.D.N.Y.1976); *Goldsberry v. Ford Motor Co.,* 343 F.Supp. 1163, 1164–65 (E.D. Wis.1972); *Walsh v. Chicago Title & Trust Co.,* 339 F.Supp. 1372, 1373 (E.D.Wis.1972). Having decided to transfer this action to the Southern District of Florida, this Court will reach no decision on the class certification issue and will instead leave it for consideration by the transferee court in the belief that the matter is best resolved by that court and in the expectation that the two cases will be consolidated.

## CONCLUSION

For the reasons set forth above, defendants' motions to dismiss are denied. Plaintiff's motion for class certification is left for the consideration of the transferee court. Plaintiff's motion to transfer is granted.

Pursuant to rule 26 of the Local Civil Rules of the Southern and Eastern Districts of New York, the Clerk of the Court shall, after five (5) days from the date of this order, mail (1) certified copies of the Court's opinion ordering transfer, its order, and docket entries in the case and (2) the originals of all other papers on file to the Southern District of Florida.

SO ORDERED.