Anthony LAZZARO, individually and as custodian for his children, Anthony R. Lazzaro, Denise Lazzaro, Christopher Lazzaro, Mark Lazzaro, James Lazzaro, and Marilyn Lazzaro; Marilyn A. Lazzaro; Let's Make a Deal Auto Inc.; Lazzaro Investing Corp.; Lazzaro Auto Sales, Inc.; Richard Keating, Nicholas Fiumano; Frank Spinelli; Michael Riegel; and Irene Riegel, on behalf of themselves and all persons similarly situated, Plaintiffs,

v.

Abraham MANBER; Solomon Manber; Douglas Bremen & Co., Inc.; Berine Enterprises, Ltd.; Sherman Fitzpatrick & Co., Inc.; Individual's Securities, Ltd.; Max Levine; Gary Purcell; Louis Cattaruzza; Ada DeFelippo; Gig Friedman; Walter Reed; Albert Lerner; and Steven F. Miller, Jr., Defendants.

No. CV 87-2153(RR).

United States District Court,
E.D. New York.

June 30, 1988.

Snitow & Pauley, New York City by William H. Pauley, III, Charles D. Cunningham, for plaintiffs.

Parker, Chapin, Flattau & Klimpl, New York City by Charles W. Stotter, for defendants Abraham Manber, Solomon Manber, Berine Enterprises, Ltd., Individual's Securities, Ltd., Max Levine, Gig Friedman, Walter Reed, Albert Lerner and Steven F. Miller, Jr.

Kenneth A. Elan, New York City, for defendant Sherman Fitzpatrick & Co., Inc.

## MEMORANDUM AND ORDER

RAGGI, District Judge:

Plaintiffs bring this class action [1] on behalf of themselves and all other persons who purchased securities in four companies—Flo-Con Corporation ("Flo-Con"), Cabletech, Inc. ("Cabletech"), Primages, Inc. ("Primages") and Telebyte Technology, Inc. ("Telebyte")—between February 8, 1982 and June 12, 1986 from defendants Sherman Fitzpatrick & Co., Inc. ("Sherman Fitzpatrick") and/or Douglas Bremen & Co., Inc. ("Douglas Bremen"), as well as on behalf of all holders of Cabletech common stock who, from May 2, 1986 through June 2, 1986, received, in exchange, common stock of Primages. In their amended complaint, plaintiffs allege violations of federal securities law, racketeering and various state law torts.

Defendants, Abraham Manber, ("A. Manber") Solomon Manber, ("S. Manber") Berine Enterprises, Ltd., ("Berine") Individual's Securities, Ltd., ("Individual's Securi-

---

1. The question of class certification is not before the court at this time.

ties") Max Levine, ("Levine") Gig Friedman, ("Friedman") Walter Reed, ("Reed") Albert Lerner, ("Lerner") Steven Miller, Jr. ("Miller") and Sherman Fitzpatrick move to dismiss the amended complaint for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), failure to plead fraud with particularity, Fed.R.Civ.P. 9(b), and failure to file suit within the statute of limitations, Fed.R.Civ.P. 12(b)(6).[2] They further urge dismissal of pendent state claims.

For the reasons set forth below, the court dismisses plaintiffs' claims—with the exception of those of Michael and Irene Riegel—under Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j(b) pertaining to the purchase of Flo–Con shares, all plaintiffs' claims under Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, and all claims for conspiracies to commit racketeering, 18 U.S.C. § 1962(d). In all other respects the motion is denied.

### I. The Factual Allegations

#### A. The Relationship among Berine, Sherman Fitzpatrick and Douglas Bremen

The amended complaint, the allegations of which must be accepted as true on this motion to dismiss, alleges that in 1981, defendant A. Manber, a Florida businessman, joined with defendant Levine, a New York stock broker then employed by Sherman Fitzpatrick, a registered broker-dealer, to form Berine, an investment advisory service. Berine initially operated out of the Mineola, New York offices of Sherman Fitzpatrick.

Thereafter, in June 1981, A. Manber became plaintiff Anthony Lazzaro's financial advisor at Berine and Levine became Lazzaro's stockbroker at Sherman Fitzpatrick. In February 1982, plaintiffs Richard Keating, Nicholas Fiumano and Frank Spinelli opened brokerage accounts with Levine at Sherman Fitzpatrick. In December of that year, plaintiff Michael Riegel opened an account with defendant Purcell, another broker at Sherman Fitzpatrick. Lazzaro, Keating, Fiumano and Riegel had minimal experience in the stock market and A. Manber, Levine, Purcell and Berine assumed discretionary authority to purchase and sell securities for their accounts.

In November 1982, Douglas Bremen was incorporated in New York as a broker-dealer, its stock held by defendants Cattaruzza and DeFelippo, siblings both employed by Sherman Fitzpatrick, and Berine. Cattaruzza and DeFelippo held their stock as nominees of A. Manber, who would become a consultant at Douglas Bremen, and his brother, defendant S. Manber.

In the Spring of 1983, Levine and Purcell resigned from Sherman Fitzpatrick to join Douglas Bremen and Berine began doing business out of Douglas Bremen's Roslyn, New York offices. At this time, and pursuant to solicitations by A. Manber, Levine and Purcell, plaintiffs transferred their accounts from Sherman Fitzpatrick to Douglas Bremen.

#### B. The Stock Transactions

##### 1. Flo–Con

On August 15, 1981, A. Manber purchased 100,000 shares of Flo–Con common stock for $11,000, ($.11/share), and entered into a financial consulting agreement with the company, which in the previous fiscal year had incurred a net loss of $232,034.

On February 8, 1982, Flo–Con made a public offering of 1,000,000 shares of common stock for $1.00 per share, a price far in excess of any reasonable valuation. Sherman Fitzpatrick was the exclusive underwriter and Levine, then still in its employ, solicited purchases from Lazzaro, Keating, Fiumano and Spinelli. In so doing, Levine falsely represented that: (1) Flo–Con had developed a new heat-recycling technology; (2) a strong aftermarket for Flo–Con shares would exist; and (3) the offering price was based on fair market value. Sherman Fitzpatrick mailed Lazza-

---

**2.** Defendants Louis Cattaruzza, Ada DeFelippo, Gary Purcell and Douglas Bremen do not join in the instant motion.

ro, Keating, Fiumano and Spinelli a prospectus regarding the offering.

Relying on the representations made by Levine and in the prospectus, Lazzaro purchased 50,000 Flo–Con shares, Keating purchased 2,000, Fiumano purchased 4,000 and Spinelli purchased 10,000.

In December 1982, Purcell, acting at the direction of A. Manber, Levine, Berine and Sherman Fitzpatrick, solicited Riegel to purchase Flo–Con shares, falsely representing that: (1) Flo–Con had developed a new heat-recycling technology; (2) Flo–Con had numerous contracts to sell its technology; and (3) the price for a Flo–Con share would rise to $10. Relying on these representations, Riegel purchased a total of 20,000 shares for an average price of $1.75 per share.

In June 1983, with plaintiffs' accounts now transferred to Douglas Bremen, A. Manber, Levine and Berine advised Lazzaro, Keating, Fiumano and Spinelli that Flo–Con was on the verge of bankruptcy and persuaded them to sell their stock for $1.375 per share.

Simultaneously, Purcell advised Riegel to hold his Flo–Con shares, continuing to represent that the price would rise to $10 per share. At the same time, Cattaruzza urged other Douglas Bremen clients to purchase Flo–Con shares at $2.50 per share. To further this promotion, Douglas Bremen had an investment newsletter, the *Cheap Investor*, tout Flo–Con's alleged client list and products.

From June 1983 through November 1983, Douglas Bremen did not report the current price for Flo–Con shares in its account statements to plaintiffs. On February 16, 1984, Flo–Con declared bankruptcy.

### 2. Cabletech

Cabletech was incorporated in Florida in 1980 with A. Manber as director, vice-president and treasurer, S. Manber as director and consultant, defendant Friedman as director and president, defendant Reed as director and consultant, and defendant Lerner as director and consultant. The Manber brothers and Reed each held 150,000

shares of the company's stock purchased in a private placement at $.05 per share.

On September 2, 1982, Cabletech publicly offered 900,000 units for $2.00 each. A unit consisted of a share of common stock and a one-year warrant, exercisable with a second such warrant in the future to purchase a share of common stock for $2.50. The co-underwriters of this offering were Sherman Fitzpatrick and defendant Individual's Securities, a New York registered broker-dealer.

A. Manber and Levine solicited Lazzaro and Fiumano to purchase Cabletech units, falsely representing that: (1) this cable television company had rapid growth potential; and (2) the offering price was based on fair market value. Sherman Fitzpatrick mailed Lazzaro and Fiumano a prospectus concerning the offering.

The prospectus falsely represented that: (1) Cabletech would devote its primary efforts to selling advertising time on cable television; (2) over 50% of the proceeds of the offering would be used to construct an "uplink" and to rent "satellite transponder time and production facilities;" (3) defendant Friedman would devote his full time and A. Manber would devote 75% of his time to the company; and (4) Cabletech would purchase 20–40% of the equity of K.S.S. Technology Corporation ("K.S.S.") to further research and development.

Relying on these oral and written representations, Lazzaro purchased 50,000 Cabletech units and Fiumano purchased 4,000.

In fact, Cabletech never commenced active operations and never used the net proceeds of the public offering—$1,281,051—for the represented purposes. Instead, the invested funds were used to finance the merger that created Telebyte, the successor to K.S.S.

From November 1983 through March 1984, defendants falsely reported a market price of $3.00 per Cabletech unit in Douglas Bremen's account statements to plaintiffs, whereas SEC filings reflected bid prices less than half that amount.

### 3. Primages

Primages was incorporated in 1981. Both Manber brothers participated in its management, held substantial equity interests in the company and licensed patents to it. In 1982, Primages recorded a net loss of $2,028,669 and a year-end per share book value of −$.20. As of February 28, 1983, its total net assets were − $801,879.

#### a. *The Stock Offering*

In April 1983, A. Manber, Levine and Berine solicited Lazzaro to purchase shares of Primages stock in its initial public offering. They falsely represented that: (1) the demand for the stock would exceed the shares allotted Douglas Bremen; and (2) the $7.00 per share offering price was based on fair market value. Douglas Bremen mailed Lazzaro, Keating, Fiumano and Spinelli a prospectus.

The Primages prospectus falsely represented that: (1) Primages held a $600,000 demand note in connection with its research and development of a new printer (without noting that the technology had already been "reduced to practice" and that Primages had surrendered the note); (2) the proceeds derived from the offering would be used to develop a line of high quality printers (omitting that $250,000 would be used to pre-pay a loan); and (3) Primages executives, officers and directors had agreed not to sell their shares for one year after the closing of the offering, except with the consent of the underwriter, (omitting that such consent would be freely given).[3]

On May 12, 1983, relying on the representations made by A. Manber, Levine and Berine, as well as the prospectus, Lazzaro purchased 12,000 Primages shares, Keating purchased 2,000, and Fiumano and Spinelli each purchased 1,000.

Several days later Lazzaro, Fiumano and Spinelli each instructed Levine to sell their Primages shares. Levine persuaded them not to sell, falsely representing that: (1) Primages would soon enter a $30 million sales contract with a Japanese corporation;

(2) the per share price would rise to $30; and (3) the stock would split two for one.

On May 20, 1983, Purcell solicited Riegel to purchase Primages stock, falsely representing that: (1) IBM was interested in purchasing Primages' product; and (2) the per share price would rise to $25, split two for one, and then rise to $100. Douglas Bremen mailed Riegel a Primages prospectus. On May 20, 1983, relying on Purcell's representations and the prosepectus, Riegel purchased 1,000 shares of Primages.

Between June 10, 1983 and April 18, 1985, Douglas Bremen made thirty-four separate purchases of Primages stock for Lazzaro's and Keating's accounts without their prior consent in an effort to inflate the market price for the stock. On many occasions, these purchases represented over 50% of the Primages shares traded that day.

In order to obtain plaintiffs' subsequent ratification of the purchases, A. Manber, S. Manber, Levine, Cattaruzza, Berine and Douglas Bremen falsely represented that: (1) major competitors were seeking to purchase Primages' technology; (2) Primages was delivering several hundred machines to purchasers each month; (3) it had developed new, secret products; (4) by November 1984, its earnings would be $1.00 per share; (5) Primages had developed a new high-speed printer that would dominate the market; and (6) Wang and NEC were interested in acquiring Primages' new technology.

Defendants failed to disclose, *inter alia*, that: (1) Primages' Image 45 cps printer was rapidly becoming obsolete; (2) in July 1984, Primages disposed of its inventory of such printers at a loss of $157,600; and (3) a patent infringement suit had been filed against Primages.

#### b. *The Merger with Cabletech*

On September 15, 1985, Cabletech agreed to merge into Primsub. Inc., a wholly-owned subsidiary of Primages. The merg-

---

**3.** In October 1983, S. Manber and several other directors and officers of Primages sold approxi-mately 102,000 restricted shares at a substantial profit.

er agreement was prepared at the direction and under the supervision of the Manbers.

On May 2, 1986, Cabletech and Primages distributed a joint proxy statement soliciting shareholder approval of the merger. Each Cabletech shareholder was to receive one share of Primages for five shares of Cabletech, this exchange ratio being premised on Cabletech's net book value of $.42 per share, compared to Primages' market value of $2.88 per share. At the time, the net book value of a Primages share was −$.12.

A. Manber, S. Manber, Friedman, Reed, Lerner and defendant Miller, a registered representative at Individual's Securities, included in the proxy solicitation an opinion by Miller that the terms of the merger were fair to Cabletech shareholders "from a financial point of view." Moreover, these same defendants and Individual's Securities represented in the joint proxy statement that Individual's Securities was an independent financial advisor, and did not disclose that it had both co-underwritten Cabletech's initial public offering and then traded Cabletech units. A. Manber, S. Manber, Friedman, Reed, Lerner and Miller also represented in the proxy statement that S. Manber had resigned from Cabletech in November 1984, and did not disclose that he had held himself out as a Cabletech director and consultant until April 1985.

In April 1986, in order to inflate the market price for Primages and thereby secure shareholder approval for the merger, A. Manber, S. Manber, Berine, Levine, Purcell, Cattaruzza, DeFelippo, Douglas Bremen and Sherman Fitzpatrick falsely represented that Primages was negotiating a $10 million contract to supply printers to a major manufacturer.

On June 12, 1986, Cabletech's inside shareholders, who constituted a majority, approved the merger of Cabletech into Primages.

### 4. Telebyte

Telebyte is a New York corporation, formed by the merger of K.S.S. and Remark Datacom Inc. into G.A.W. Control Corp., which simultaneously changed its name to Telebyte. S. Manber, a director and principal shareholder of both K.S.S. and G.A.W., received a total of 157,649 shares of Telebyte common stock as a result of the merger.

In July 1983, Telebyte, with Douglas Bremen acting as its agent, made a private offering of 200,000 shares of common stock at $2.50 per share. At that time, A. Manber solicited Lazzaro to purchase Telebyte, falsely representing, *inter alia*, that Telebyte was developing an advanced telephone modem. Douglas Bremen mailed Lazzaro a private placement memorandum. On July 18, 1983, Lazzaro, relying on A. Manber's representations and the memorandum, purchased 4,000 Telebyte shares.

By September 30, 1983, Telebyte had experienced a net loss of $57,430 (−$.05/share). The book value of its stock was $.48 per share.

In November 1983, Telebyte began preparing a public offering of stock with Douglas Bremen as the exclusive underwriter. Cattaruzza solicited Lazzaro and Levine solicited Fiumano to purchase Telebyte units at $6.00 each, falsely representing that: (1) Telebyte was developing an advanced telephone modem; (2) the issue was oversold; (3) a strong aftermarket for Telebyte shares would exist; and (4) the offering price was based on fair market value. Douglas Bremen mailed Lazzaro and Fiumano a Telebyte prospectus.

Lazzaro advised Cattaruzza that, due to his position in Primages, he would need to borrow funds to invest in Telebyte. Cattaruzza reiterated that Telebyte's offering was oversold and that Lazzaro would, therefore, be able profitably to sell his stock within a few days. Relying on these representations, Lazzaro borrowed money and purchased 10,000 Telebyte units. Fiumano purchased 1,000 units.

Throughout January, 1984, A. Manber, S. Manber, Levine, Purcell, Cattaruzza, DeFelippo, Berine and Douglas Bremen falsely reported a liquid and rising market and an inflated price for Telebyte. When, however, on January 12, 1984, Lazzaro instructed Levine to sell his units for the then-rep-

resented bid price of $8.25 per unit, Douglas Bremen was unable to effect such a sale. Similarly, Douglas Bremen was unable to sell Telebyte units for Fiumano in mid-January at the then-reported price.

## II. Discussion

In considering a motion to dismiss, a court is required to read the complaint with "great generosity." *Yoder v. Orthomolecular Nutrition Inst., Inc.*, 751 F.2d 555, 558 (2d Cir.1985). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974). Thus, all allegations of fact in the complaint must be accepted as true, *Ad–Hoc Comm. of the Baruch Black & Hispanic Alumni Ass'n v. Bernard M. Baruch College*, 835 F.2d 980, 982 (2d Cir.1987), and all inferences liberally drawn in favor of the plaintiffs. *Jenkins v. McKeithen*, 395 U.S. 411, 421, 89 S.Ct. 1843, 1848–49, 23 L.Ed.2d 404 (1969); *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). "[U]nless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," the motion to dismiss must be denied. *Morales v. New York State Dep't of Corrections*, 842 F.2d 27, 30 (2d Cir.1988) (quoting *Bass v. Jackson*, 790 F.2d 260, 262 (2d Cir.1986)).

### A. Failure to State a Claim

#### 1. Securities Violations

##### a. Section 10(b) claims

Claims One through Four of the amended complaint charge defendants A. Manber, S. Manber, Levine, Purcell, Berine, Douglas Bremen, Cattaruzza and DeFelippo with primary violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5, in connection with the sale of securities for Cabletech, Primages, Telebyte and Flo–Con respectively. Claims

One and Four name Sherman Fitzpatrick as a primary violator in connection with the Cabletech and Flo–Con sales.

The moving defendants argue that plaintiffs fail to state a claim for relief insofar as the complaint fails adequately to allege that "[1] in connection with the purchase or sale of securities, [2] the defendant[s], acting with scienter, [3] made a false material misrepresentation or omitted to disclose material information and [4] that plaintiff[s'] reliance on defendant[s'] actions caused [them] injury." *Stern v. Leucadia Nat'l Corp., Inc.*, 644 F.Supp. 1108, 1110 (S.D.N.Y.1986) (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985)).

##### (1). "In connection with" a purchase or sale of a security

■ Defendants argue that any alleged misrepresentations or omissions were not made "in connection with" the purchase or sale of the subject securities. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731, 95 S.Ct. 1917, 1923, 44 L.Ed. 2d 539 (1975) (implied private cause of action under Rule 10b–5 extends only to purchasers and sellers of securities). Defendants point to certain paragraphs in the amended complaint and argue that, at best, defendants induced plaintiffs to ratify or retain various purchases of securities.

While the mere retention of securities may not be actionable under Rule 10b–5, *Troyer v. Karcagi*, 476 F.Supp. 1142, 1148 (S.D.N.Y.1979), plaintiffs' amended complaint in fact alleges more than mere retention. Regarding each of the four companies whose securities are at issue, plaintiffs allege that, in reliance on defendants' representations, they actually purchased the securities.[4] This court is satisfied that these allegations adequately set forth misrepresentations "in connection with" the purchase of securities. *See Marbury Management, Inc. v. Kohn*, 629 F.2d 705, 710 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980) (complaint actionable where misrepresentations

---

4. See ¶¶ 83, 84 (Cabletech); ¶¶ 110, 120 (Primages); ¶¶ 188, 197 (Telebyte); ¶¶ 214, 216 (Flo–Con).

relate to both the purchase and retention of securities); *accord Connors v. Lexington, Ins. Co.,* 666 F.Supp. 434, 443–44 (E.D.N.Y. 1987); *Morris v. Gilbert,* 649 F.Supp. 1491, 1496 (E.D.N.Y.1986).

### (2). *Scienter*

The scienter element of a 10b–5 claim requires that a defendant have an "intent to defraud" and knowingly use "a device, scheme or artifice to defraud." *In re Gas Reclamation, Inc. Sec. Litig.,* 659 F.Supp. 493, 502 (S.D.N.Y.1987); *Fingar v. Prudential–Bache Securities, Inc.,* 662 F.Supp. 1119, 1121 (E.D.N.Y.1987). Throughout their complaint, plaintiffs allege that defendants' misconduct was knowingly engaged in to manipulate the market price for the stocks they encouraged plaintiffs to purchase. Defendants contend that plaintiffs have not pleaded a factual basis for these allegations.

■ Pleadings as to a defendant's state of mind may be averred generally so long as a plaintiff states circumstances that provide a factual basis for the conclusion. *Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1003–04 (2d Cir.1988). In this case the court is satisfied that the detailed recitation of the relationships among the various defendants and the companies whose stocks they or their agents were promoting, as well as the financial status of these companies, are adequate to provide these circumstances and allow this case to go forward to discovery.

### (3). *Material Misrepresentations and Omissions*

Defendants argue that plaintiffs' claims of poor investment recommendations cannot alone constitute the sort of factual misrepresentation prohibited by Rule 10b–5. In any event, they argue that the respective prospectuses disclaim any representations made by defendants.

■ In fact, the "knowing recommendation of an unsuitable security states a cause of action for fraud under Section 10(b)." *Clark v. Kidder, Peabody & Co., Inc.,* 636 F.Supp. 195, 198 (S.D.N.Y.1986), citing *Clark v. John Lamula Investors,*

*Inc.,* 583 F.2d 594 (2d Cir.1978); *see, e.g., Mauriber v. Shearson/American Express, Inc.,* 567 F.Supp. 1231, 1237 (S.D.N.Y.1983) (cause of action for unsuitable investment recommendation upheld where broker knowingly misrepresents that securities are suitable); *In re Catanella and E.F. Hutton & Co., Inc. Sec. Litig.,* 583 F.Supp. 1388, 1405 (E.D.Pa.1984). In this case, the alleged unsuitability of the recommendations is supported by specific factual allegations as to the financial status of the four underlying companies. The related misrepresentations of the defendants, allegedly made with scienter, are also detailed.

■ Defendants contention that plaintiffs in fact "ratified" the stock transactions at issue and, therefore, cannot complain of misrepresentations prior to purchase, *see Altschul v. Paine, Webber, Jackson & Curtis Inc.,* 518 F.Supp. 591, 594 (S.D.N.Y.1981), is not the inescapable conclusion to be drawn from the complaint. In sharp contrast to the sophisticated investor in *Altschul,* who had "full knowledge of the speculative nature of his investments," *id.* at 594, the instant plaintiffs claim that their ratifications were procured without their full knowledge and, indeed, as the result of on-going manipulations and misrepresentations aimed at preventing their awareness of the high risks they were taking.

■ Defendants further argue that the alleged misrepresentations were merely opinions and predictions, not actionable under Rule 10b–5. *Marx & Co., Inc. v. Diner's Club, Inc.,* 550 F.2d 505, 514 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). In fact, a prediction or opinion can be actionable if it is made with the intent to deceive or a reckless disregard for its truth. *Rolf v. Blyth, Eastman Dillon & Co., Inc.,* 570 F.2d 38, 48 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) ("A representation certified as true ... when knowledge there is none, a reckless misstatement, or an opinion based on grounds so flimsy as to lead to the conclusion that there was no genuine belief in its truth, are all sufficient upon

which to base liability."); *see also Marx & Co., Inc. v. Diner's Club, Inc.*, 550 F.2d at 515 (scienter necessary to show predictions constituted misrepresentations under Rule 10b–5).

As already detailed, plaintiffs complaint does adequately allege that defendants knowingly made false or unsupported representations. Indeed, a fair reading of the complaint demonstrates that not all the misrepresentations alleged are mere statements of opinion and conclusion, but rather of fact.

■ Defendants contend that the various prospectuses at issue disclaim any representations and omissions made by defendants and, in some instances, directly contradict specific misrepresentations alleged in the amended complaint. While it is true that "liability probably should not be imposed on the basis of words that 'bespeak caution'," *Goldman v. Belden, Jr.*, 754 F.2d 1059, 1068 (2d Cir.1985) (quoting *Polin v. Conductron Corp.*, 552 F.2d 797, 806 n. 28 (8th Cir.), *cert. denied*, 434 U.S. 857, 98 S.Ct. 178, 54 L.Ed.2d 129 (1977)); *see Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986), the allegations in the complaint present real questions as to the materiality of the alleged specific oral misrepresentations in light of the general disclaimers in the prospectuses. Such questions of materiality should not be resolved on a motion to dismiss. *See Goldman v. Belden*, 754 F.2d at 1067 (materiality in the mind of a reasonable investor is a mixed question of law and fact generally not resolvable on motion to dismiss).

### (4). *Causation*

■ To succeed on a 10b–5 claim, plaintiffs must prove that they relied on defendants' misrepresentations, thereby sustaining injury. *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d at 61. The twin requirements of reliance and injury are commonly referred to, respectively, as transaction and loss causation. *Bennett v. United States Trust Co.*, 770 F.2d 308, 313 (2d Cir.1985), *cert. denied*, 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986). Defendants argue that plaintiffs have failed adequately to allege transaction and loss causation.

■ To show transaction causation in a misrepresentation case, plaintiffs must demonstrate that they relied on the misrepresentations in question in entering into the transactions which caused them harm. To show transaction causation in a case of omission or nondisclosure, actual reliance need not be shown, but a plaintiff must establish that the facts at issue were material, *i.e.*, that a reasonable investor might have considered them important in making his investment decision. *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380–82 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975).

To show loss causation, a plaintiff must show that the "damage complained of [was] one of the foreseeable consequences of the misrepresentation." *Connors v. Lexington Ins. Co.*, 666 F.Supp. at 444 (quoting *Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 20–21 (2d Cir.1986) *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987)). "This required causal connection may not be supplied by 'but for' allegations." *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d at 61 (quoting *Chemical Bank v. Arthur Anderson & Co.*, 726 F.2d 930, 943 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984)).

■ In any event, recovery is limited to "actual damages," 15 U.S.C. § 78bb(a), generally determined by measuring a plaintiff's "out-of-pocket" loss. *Kronfeld v. Advest, Inc.*, 675 F.Supp. 1449, 1455 (S.D.N.Y. 1987). The "defrauded buyer of securities is entitled to recover only the excess of what he paid over the value of what he got ..." *Levine v. Seilon, Inc.*, 439 F.2d 328, 334 (2d Cir.1971), and the "question is not what the plaintiff might have gained, but what he lost by being deceived into the purchase." *Estate Counseling Service, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 303 F.2d 527, 533 (10th Cir. 1962).

In this case, plaintiffs have alleged that various named defendants made specific misrepresentations to induce their purchases of high-risk stock. Others of the defendants are alleged to have failed to disclose material facts about the true financial condition of the companies offering stock, which facts might well have been important to a reasonable investor. This suffices to plead transaction causation.

Similarly, plaintiffs allege that defendants' misrepresentations, omissions and fraudulent schemes to manipulate the market and artificially inflate the price of the securities at issue caused them actual financial loss of some portion of their investment. Such allegations suffice to plead loss causation.

Nevertheless, certain plaintiffs fail adequately to plead loss causation regarding their purchase of Flo–Con shares insofar as they profited from the transaction. Except for the Riegels, plaintiffs purchased Flo–Con at a per share price of $1.00 and sold at a per share price of $1.35. Although plaintiffs argue that they would have realized a greater return on their money but for defendants' conduct, a thirty-five per cent return on a one-year investment hardly constitutes the kind of financial injury cognizable under Rule 10b–5. *See, e.g., Shults v. Henderson*, 625 F.Supp. 1419, 1426 (W.D.N.Y.1986) *aff'd* 805 F.2d 391 (2d Cir.1986) (complaint alleging fraudulent conduct by fiduciary in violation of Rule 10b–5 dismissed where challenged conduct yielded pecuniary benefit rather than detriment to plaintiff); *see generally Barrows v. Forest Laboratories, Inc.*, 742 F.2d 54 (2d Cir.1984); *Levine v. Seilon Inc., supra*.

A liberal reading of the complaint suggests that the Riegels, who purchased Flo–Con at varying per share prices averaging $1.75, may indeed have sustained actual damages. These plaintiffs may, therefore, pursue a claim under Section 10(b) regarding the Flo–Con offering.

Specifically as to defendant Sherman Fitzpatrick, the court notes that it is alleged to have directly participated, as Cabletech's underwriter, in its public offering and in the fraudulent establishment of an inflated offering price for Cabletech shares. It is also alleged to have participated in the issuance of misleading prospectuses, upon which plaintiffs relied, in the offerings of Cabletech and Flo–Con, and knowingly to have misrepresented Primages' business prospects so as to induce plaintiffs to consent to the proposed merger of Cabletech and Primages. This merger proximately caused alleged financial loss to plaintiffs who exchanged their shares of Cabletech for Primages shares at an allegedly unfair ratio. Taking these allegations as true, the court cannot say that plaintiffs can prove no set of facts on which Sherman Fitzpatrick can be shown to have had a causal effect on plaintiffs' purchases and subsequent losses in Cabletech and the Riegel's losses in Flo–Con.

The court dismisses all plaintiffs' 10(b) claims as they pertain to Flo–Con with the exception of those of the Riegels. The motion to dismiss all other Section 10(b) claims is denied.

### b. *Section 17(a)*

In plaintiffs' Claims Five through Eight, they allege that defendants, A. Manber, S. Manber, Levine, Sherman Fitzpatrick, Berine, Douglas Bremen, Purcell, Cattaruzza and DeFelippo violated § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, which proscribes fraud in the offer and sale of securities. Defendants urge dismissal on the ground that no express right of action is provided by Section 17(a) and no private right of action may be implied. The court concurs and dismisses these claims.

The question of a cause of action under 17(a) is one on which the circuits have differed. *Compare Kirshner v. United States*, 603 F.2d 234, 241 (2d Cir.1978), *cert. denied*, 442 U.S. 909, 99 S.Ct. 2821, 61 L.Ed.2d 274 (1979) ("the language of § 17 is broad enough to imply a private cause of action"); *Daniel v. International Brotherhood of Teamsters*, 561 F.2d 1223, 1245–46 (7th Cir.1977), *rev'd on other grounds*, 439 U.S. 551, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979) (same); *Newman v. Prior*, 518 F.2d 97, 99 (4th Cir.1975) (same), *with In re*

*Washington Pub. Power Supply Sys. Sec. Litig.*, 823 F.2d 1349, 1353–54 (9th Cir.1987) (no implied right to action under Section 17(a)); *Deviries v. Prudential–Bache Sec. Inc.*, 805 F.2d 326, 328 (8th Cir.1987) (no right of action); *Landry v. All American Assurance Co.*, 688 F.2d 381, 388 (5th Cir. 1982) (same).

Critical to the Second Circuit's holding in *Kirshner* was Judge Friendly's observation in *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 867 (2d Cir.1968) (Friendly, J., concurring), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), that "there seemed little practical point in denying the existence of such an action under § 17" once it is established that an aggrieved buyer has a private action under § 10(b) of the 1934 Act. In the twenty years since Judge Friendly's concurrence, however, the assumed similarity between the elements of a § 10(b) and a § 17(a) cause of action has begun to erode. *See, e.g., Aaron v. SEC*, 446 U.S. 680, 697, 100 S.Ct. 1945, 1956, 64 L.Ed.2d 611 (1980) (a showing of negligence is sufficient under 17(a)(2) or (3), although scienter still required under 17(a)(1)); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 201, 96 S.Ct. 1375, 1384–85, 47 L.Ed.2d 668 (1976) (scienter, and not mere negligence, required under 10(b)).

Thus, in recent years the Second Circuit has declined to take a position as to the existence of a § 17(a) cause of action. *See, e.g., Manufacturers Hanover Trust v. Drysdale Sec. Corp.*, 801 F.2d 13, 25 (2d Cir.1986), *cert. denied*, 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987) (declining to comment on existence of private § 17(a) action); *Yoder v. Orthomolecular Nutrition Inst. Inc.*, 751 F.2d 555, 559 n. 3 (2d Cir.1985) (existence of private § 17(a) action may be open to reexamination); *Zerman v. Ball*, 735 F.2d 15, 23 (2d Cir.1984) (no view expressed as to private action under § 17(a)). The district courts in the circuit, on the other hand, have begun to find no § 17(a) private cause of action. *See Cohen v. Goodfriend*, 665 F.Supp. 152, 155 (E.D.N.Y.1987); *Ackerman v. Clinical*

*Data, Inc.*, 1985 Fed.Sec.L.Rep. (CCH) 91,-566 (S.D.N.Y. July 8, 1985).[5]

In *Ackerman v. Clinical Data, Inc.*, Judge Haight questioned the similarity between 10(b) and 17(a) assumed in *Kirshner*. Focusing specifically on 10(b)'s requirement of scienter, he held that to imply a private right of action under 17(a) as a kind of companion action to one brought under 10(b) would "allow and encourage the total circumnavigation of the new restrictions the court has placed on a Section 10(b) cause of action." *Id.* at 91,570 (quoting *Kimmel v. Peterson*, 565 F.Supp. 476, 485 (E.D.Pa.1983)). Moreover, applying the four-part test set forth in *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), for determining whether a private remedy should be implied, Judge Haight found that the legislative intent, history and the "carefully constructed framework of the securities laws" cut against an implied right of action under Section 17(a). *Ackerman v. Clinical Data, Inc.*, 1985 Fed.Sec.L.Rep. (CCH) 91,566, 91,-571; *accord Cohen v. Goodfriend*, 665 F.Supp. 152 (E.D.N.Y.1987).

This court is persuaded by the analysis in *Ackerman v. Clinical Data, Inc.*, followed in *Cohen v. Goodfriend, supra*, and, therefore, dismisses Claims Five through Eight.

c. *Section 14(a)*

Plaintiffs allege in the Ninth Claim of their complaint that defendants A. Manber, S. Manber, Friedman, Reed, Lerner, Miller and Individual's Securities have violated Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and Rule 14a–9(a), 17 C.F.R. 240.14a–9, insofar as they solicited proxies in connection with the proposed Cabletech/Primages merger based on knowing misrepresentations and omissions. Defendants move to dismiss on the grounds that: (1) plaintiffs' allegation of an unfair merger is not actionable under § 14(a); (2) no actual "solicitation" by defendants has been alleged; (3) any misrepresentation concerning the prior business relationships of any defendants with Cable-

**5.** The parties have not cited, nor has the court found, any cases in this decade in which a court in this circuit has recognized a private cause of action under § 17(a).

tech and Primages is not material; (4) plaintiffs cannot show that the proxy solicitation caused the merger; and (5) no injury to plaintiffs has been alleged.

A liberal reading of the complaint reflects that plaintiffs are not simply complaining about the fairness of the merger in question but are pointing to specific alleged misrepresentations or omissions that may very well have been of significance to a reasonable investor in deciding how to vote on the merger. *See TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Mendell v. Greenberg*, 612 F.Supp. 1543, 1548 (S.D.N.Y.1985).

■ As to defendants' argument that plaintiffs have not adequately alleged solicitation, the court notes that the term "solicitation" is broadly construed to include any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." 17 C.F.R. § 240.14a–1. A communication to shareholders may constitute a proxy solicitation, even without an express request for a proxy, if it is "part of 'a continuous plan' intended to end in solicitation, and to prepare the way for success." *Studebaker Corp. v. Gittlin*, 360 F.2d 692 (2d Cir.1966) (quoting *SEC v. Okin*, 132 F.2d 784 (2d Cir.1943)); *see Trans World Corp. v. Odyssey Partners*, 561 F.Supp. 1315, 1319 (S.D. N.Y.1983). To establish liability where there is no active participation in the solicitation effort, of course, a substantial connection must be shown between the use of the name of the party to be charged with liability and the solicitation effort. *Mendell v. Greenberg*, 612 F.Supp. at 1551.

■ In this case, plaintiffs specifically allege that Cabletech and Primages issued a joint proxy statement and that defendants A. Manber, S. Manber, Friedman, Reed, Lerner, Miller and, in some instances, Individual's Securities, were responsible for knowing misrepresentations or omissions therein, with the express purpose of thereby inducing shareholder consent. Whether or not plaintiffs will be able to prove such active misconduct by each de-

fendant in connection with the solicitation is not the issue presently before this court. The allegations are sufficient to warrant the case going forward. *Cf. Mendell v. Greenberg*, 612 F.Supp. at 1552 (where plaintiff did not allege knowing or intentional misconduct by investment bank whose name and opinion appeared in proxy statement, no 14(a) action maintainable).

■ Defendants' contention that the omitted prior relationship between Cabletech and Individual's Securities is immaterial is not so obvious a conclusion as to support dismissal. *See Goldman v. Belden*, 754 F.2d at 1067. Given the alleged relationship between Cabletech and Primages, and the variance between the Miller opinion and certain corporate financials, this court will allow the case to go forward so that all pertinent evidence can be discovered.

■ Defendants' contention that plaintiffs cannot show the proxy solicitation caused the merger relies primarily on the fact that the merger was approved by inside shareholders who constituted a majority. But the Second Circuit has expressly recognized a:

> ... strong ... policy for accurate and complete information to the holder ... whose vote is solicited but not needed. ... The equities call for protection of the minority shareholder when he is the most helpless,.... To require strict causation would "sanction all manner of fraud and overreaching in the fortuitous circumstance that a controlling shareholder exists."

*Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d at 383. (quoting *Swanson v. American Consumer Industries, Inc.*, 415 F.2d 1326, 1331 (7th Cir.1969)); *see Laurenzano v. Einbender*, 264 F.Supp. 356, 362 (E.D.N. Y.1966) ("The vote is not legally predetermined simply because it seems practically predictable").

Plaintiffs' allegation that "Lazzaro and Fiumano received Primages units and warrants for their Cabletech units at the established exchange ratio of 1 to 5 and thereby suffered substantial damage" is sufficient

368

to allege injury. *See Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d at 381. (economic loss alleged in that there was an unequal, unfair merger ratio).

Accordingly, defendants' motion to dismiss plaintiffs' claim under Section 14(a) and Rule 14a–9(a) of the Securities Exchange Act is denied.

### d. *Secondary Liability on Securities Claims*

In addition to suing certain of the named defendants for primary violations of the securities laws, plaintiffs allege four theories under which all defendants are secondarily liable for the complained-of conduct: (1) control person liability; (2) aiding and abetting; (3) conspiracy; and (4) respondeat superior. Defendants' motion to dismiss these claims is denied.

#### (1). *Control Person Liability*

Section 20(a) of the Securities Exchange Act of 1934 permits liability to be derivatively imposed on those who directly or indirectly control primary violators of the securities laws. 15 U.S.C. § 78t(a).

In their Eleventh Claim, plaintiffs allege that Sherman Fitzpatrick controlled A. Manber, S. Manber, Berine, Levine, Purcell, Cattaruzza and DeFelippo. Sherman Fitzpatrick argues that it had no relationship with the Manbers or Berine and that, in any case, it cannot be held accountable for alleged wrongdoing after plaintiffs' May 1983 transfer of their accounts.

In their Twelfth Claim, plaintiffs allege that the Manbers controlled Douglas Bremen, Sherman Fitzpatrick, Berine, Levine, Purcell, Cattaruzza and DeFelippo. The Manbers argue that the complaint fails to allege facts sufficient to establish their control over these entities or persons.

In their Fourteenth Claim, plaintiffs allege that A. Manber, Levine and Berine controlled Douglas Bremen. Again defendants complain of inadequate factual support for this contention.

■ Control, as used in § 20(a), requires " 'only some indirect means of discipline or influence short of actual direction,' " *Drobbin v. Nicolet Instrument Corp.*, 631 F.Supp. 860, 884 (S.D.N.Y.1986) (quoting *Myzel v. Fields*, 386 F.2d 718, 738 (8th Cir.1967), *cert. denied*, 390 U.S. 951, 88 S.Ct. 1043, 19 L.Ed.2d 1143 (1968)), and may arise not only from stock ownership, but from "other business relationships, interlocking directors, family relationships and a myriad of other factors." *Id.* at 885 (quoting *Harriman v. E.I. DuPont De-Nemours & Co.*, 372 F.Supp. 101, 105 (D.Del.1974)). Common law relationships such as principal/agent or employer/employee need not be established for § 20(a) liability to attach. *Moscarelli v. Stamm*, 288 F.Supp. 453, 460 n. 5 (E.D.N.Y.1968).

Thus, courts have focused on the "power or potential power to influence and control the activities of a person, as opposed to the actual exercise thereof." *Rochez Bros. v. Rhoades*, 527 F.2d 880, 890–91 (3rd Cir. 1975). *See, e.g., Marbury Management Inc. v. Kohn*, 629 F.2d at 716 (§ 20(a) liability shown where primary violator completed the fraudulent sales of securities through the "controlling" defendant brokerage house that received a commission on these transactions); *Moss v. Morgan Stanley Inc.*, 553 F.Supp. 1347, 1357 (S.D.N.Y.1983), *aff'd* 719 F.2d 5 (2d Cir.1983), *cert. denied* 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984) (§ 20(a) claim stated by showing that employee acted in the scope of his employment); *Troyer v. Karcagi*, 476 F.Supp. 1142, 1150 (S.D.N.Y.1979) (corporate employer may be held liable under § 20(a) for primary violation of employee).

Culpability by controlling persons requires only a showing of negligence. *Drobbin v. Nicolet Instrument Corp.*, 631 F.Supp. at 886 (discussing *Marbury Management Inc. v. Kohn*, 629 F.2d at 714–16); *contra Rochez Bros. v. Rhoades*, 527 F.2d at 889–90 (secondary liability cannot be imposed under § 20(a) unless defendant was a culpable participant in the fraud).

■ Applying these principles to the instant case, the court finds the complaint adequately to allege "controlling person" liability.

Sherman Fitzpatrick as the broker-dealer that employed Levine, Purcell, Cattaruzza and DeFelippo is properly chargeable with their alleged misconduct while in its employ. *See Marbury Management Inc. v. Kohn,* 629 F.2d at 716. While the mere fact that Berine maintained its offices on Sherman Fitzpatrick's premises and that the Manbers were associated with Berine may not, without more, support a claim that Sherman Fitzpatrick controlled these defendants, such a conclusion will be reserved until the conclusion of discovery when the parties have fully explored the nature of the close relationship alleged.

Similarly, the court finds sufficient facts alleged to allow plaintiffs to pursue their claim that the Manbers controlled Douglas Bremen, Sherman Fitzpatrick, Berine, Levine, Purcell, Cattaruzza and DeFelippo. Berine was, after all, the creation of A. Manber and Levine. Although Douglas Bremen was technically owned by Cattaruzza, DeFelippo and Berine, plaintiffs allege that Cattaruzza and DeFelippo were only nominees of the Manbers. Through control of Douglas Bremen, A. Manber and S. Manber, as well as Berine and Levine, may very well have controlled its brokers, namely Cattaruzza, DeFelippo and Purcell.

The Manbers' control over Sherman Fitzpatrick is a closer question but, in light of the complex relationships alleged, one that the court will not resolve before discovery.

The motion to dismiss plaintiffs' "controlling person" claim is denied.

### (2). *Aiding and Abetting*

In their Fifteenth Claim, plaintiffs allege that, to the extent any named defendant did not commit a primary violation of the securities laws, each knew of the violations alleged and intentionally and substantially assisted in their commission.

To state a claim for aiding and abetting a securities law violation, plaintiff must allege:

(1) a securities law violation by the primary wrongdoer; (2) knowledge of the purported violation on the part of the aider and abettor; and (3) conduct by the aider constituting substantial assistance in achieving the primary wrongdoer's fraud.

*Connors v. Lexington Ins. Co.,* 666 F.Supp. at 445; *see Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d at 47–48.

■ This memorandum has already discussed the adequacy of plaintiffs' allegations of a primary violation. The element of knowledge of the purported violation may be satisfied by proof of reckless conduct. *Rolf v. Blyth, Eastman Dillon & Co.,* 570 F.2d at 47. The element of substantial assistance requires only that the conduct of the aider be a "substantial causal factor" in the perpetuation of the primary fraud, *id.* at 48, or that the aider's actions have "the cumulative effect of helping to prevent the plaintiffs and others from discovering [defendants'] fraud." *First Fed. Sav. & Loan Assoc. of Pittsburgh v. Oppenheim, Appel Dixon & Co.,* 629 F.Supp. 427, 443 (S.D.N.Y.1986). Inaction on the part of the alleged aider or abettor, while not generally treated as substantial assistance, will satisfy the third required element if such inaction was intentionally designed to aid the primary fraud. *Connors v. Lexington Ins. Co.,* 666 F.Supp. at 446.

The specific allegations against A. Manber, S. Manber, Levine, Berine and Sherman Fitzpatrick have already been discussed. If proved, they would support a jury's verdict against them either as primary violators or aiders and abettors.

■ Of the remaining moving defendants, Individual's Securities is alleged fraudulently to have established an inflated initial offering price for Cabletech units, knowing that this was not supported by other financials, and to have knowingly misrepresented its dealings with Cabletech in the proxy statement wherein one of its employees characterized the merger terms as fair. The court finds these pleadings sufficient to state a claim for either primary violation of the securities laws or aiding and abetting.

■ Individual's Securities' employee Miller is alleged to have given the opinion that the terms of the Cabletech merger

were fair, despite financial evidence to the contrary. Although plaintiffs do not specifically allege that this opinion was rendered with express knowledge of its falsity or reckless disregard for the truth, a liberal reading of the complaint supports such an inference and, therefore, renders dismissal inappropriate.

■ Friedman, Reed and Lerner are specifically alleged to have made misrepresentations and omissions in the proxy statement regarding the independence of Individual's Securities as an advisor and S. Manber's relationship with Cabletech. A representation that an investment advisor, furnishing an opinion of fairness in a proxy statement, is independent, when made by employees who knew or should have known this to be false, suffices to state a claim of aiding and abetting a securities law violation.

Defendants' motion to dismiss plaintiffs' claim of aiding an abetting is denied.

### (3). *Conspiracy*

In their Twentieth through Twenty-Fourth Claims, plaintiffs charge various combinations of the defendants with conspiring to commit the primary violations of §§ 10(b) and 14(a) alleged.

■ To state a claim for conspiracy to violate the securities laws, a plaintiff must plead: (1) an agreement between the parties alleged to be a part of the conspiracy; and (2) a wrongful act committed in furtherance of the conspiracy. *Whitebread (US) Holdings, Inc. v. Baron Philippe De Rothschild, S.A.*, 630 F.Supp. 972, 983 (S.D.N.Y.1986).

> Where possible, there should be some details of time and place and the alleged effect of the conspiracy. This is not to say that the pleader must plead his evidence; further details may be secured by means of discovery, and related devices. Moreover, great leeway should be allowed the pleader, since by the nature of the conspiracy, the details may not be readily known at the time of the pleading.

*Kravetz v. Brukenfeld*, 591 F.Supp. 1383, 1387–88 (S.D.N.Y.1984) (quoting 2A J. Moore & J. Lucas, Moore's Federal Practice ¶ 8.17[5], at 8–180 through 8–183 (1984) (footnotes omitted)). *See also Rooney Pace, Inc. v. Reid*, 605 F.Supp. 158, 162 (S.D.N.Y.1985).

■ In this case, defendants complain that plaintiffs fail to plead an agreement or outline its parameters. But "[t]he lack of an express allegation of an agreement is not fatal to the plaintiffs' conspiracy claims." *First Fed. Sav. & Loan Assoc. of Pittsburgh v. Oppenheim Appel, Dixon & Co.*, 629 F.Supp. at 443. In 224 numbered paragraphs, plaintiffs detail an alleged scheme to offer securities at inflated prices, manipulate the market for these securities and thereby defraud the plaintiffs and the public. The particular actions taken to further the fraud are set forth, as well as the times, places and persons involved, to the extent possible. Given that conspiracies frequently require presumably clandestine activities, knowledge of which would be within defendants' exclusive control, *Rooney Pace, Inc. v. Reid*, 605 F.Supp. at 162–63, the court is satisfied that the pleading of conspiracy is sufficient to warrant further proceedings and, therefore, denies defendants' motion to dismiss this claim.

### (4). *Respondeat Superior*

■ Sherman Fitzpatrick challenges the Twenty-Fifth Claim, arguing that to the extent any alleged conduct occured after May, 1983—when plaintiffs transferred their brokerage accounts to Douglas Bremen—it cannot be held liable under the theory of respondeat superior. Because Sherman Fitzpatrick may nevertheless be liable for acts of its employees committed within the scope of their employment prior to May 1983, the court declines to dismiss this claim. *See Marbury Management, Inc. v. Kohn*, 629 F.2d at 716.

### 2. Racketeering

In their Twenty-Sixth through Thirty-First Claims, plaintiffs allege that certain of the defendants did commit and conspired to commit violations of the Racketeer Influ-

enced and Corrupt Organizations Act
("RICO"), 18 U.S.C. §§ 1961–1968.

### a. *The Substantive RICO Claims*

To state a substantive RICO claim under
§ 1962(c), plaintiffs must plead that de-
fendants were responsible for "(1) conduct
(2) of an enterprise (3) through a pattern (4)
of racketeering activity." *Sedima, S.P.R.
L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct.
3275, 3285, 87 L.Ed.2d 346 (1985) (footnote
omitted); *Cullen v. Margiotta*, 811 F.2d
698, 712–13 (2d Cir.), *cert. denied,* — U.S.
——, 107 S.Ct. 3266, 97 L.Ed.2d 764 (1987).
Plaintiffs must also show that they were
injured in their business or property by
reason of the RICO violations. *In re Gas
Reclamation, Inc. Sec. Litig.*, 659 F.Supp.
493, 511 (S.D.N.Y.1987).

Defendants argue that plaintiffs have
failed properly to plead: (1) an enterprise
distinct from the RICO persons; (2) the
necessary predicate acts of racketeering;
(3) a "pattern" of racketeering activity or a
continuing enterprise; and (4) causation.

### (1). *"Persons" versus "Enterprise"*

■ The Second Circuit has plainly held
that a corporate entity cannot simulta-
neously constitute both the RICO person
charged with criminal conduct and the
RICO enterprise whose affairs are unlaw-
fully affected by the RICO person. *Ben-
nett v. United States Trust Co.*, 770 F.2d
308, 315 (2d Cir.1985), *cert. denied,* 474
U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776
(1986); *see Cullen v. Margiotta*, 811 F.2d
at 729–30.

In fact, plaintiffs have taken care not to
name Douglas Bremen, Sherman Fitz-
patrick and Berine as defendants in the
RICO claims in which these entities are the
alleged enterprises.[6] Defendants argue
that because these entities are, in other
claims in the complaint, alleged to have
committed the securities violations that are
predicate acts for the RICO claims, the
rationale of *Bennett* nevertheless pre-
cludes the maintenance of the instant com-
plaint. This court disagrees.

Among the purposes of RICO is to pro-
vide a means of holding to legal account
those persons or entities who, by virtue of
their control over, or association with, an
enterprise, cause that enterprise to operate
in a way violative of the law. 18 U.S.C.
§ 1962(c). Presumably then, in many cases
a RICO enterprise may itself engage in
discrete unlawful acts and be liable to
those injured by them. While the enter-
prise cannot itself be charged with racke-
teering, there is no sound policy reason to
dismiss such a claim against those whose
conduct is alleged to have dictated the en-
terprises' misdeeds.

### (2). *Predicate Acts of Racketeering Activity*

The "pattern of racketeering activity"
discussed in 18 U.S.C. § 1962(c) requires a
RICO defendant to have committed "at
least two predicate acts of racketeering
activity." *Id.* § 1961(5). Fraud in the sale
of securities, 18 U.S.C. § 1961(1)(D), and
mail and wire fraud, 18 U.S.C. § 1961(1)(B),
are both recognized as racketeering activi-
ties.

For reasons already stated, the court
finds that plaintiffs have adequately al-
leged more than two acts of securities
fraud by each defendant.

■ Further, the complaint adequately
alleges specific acts of mail fraud. The
court finds the requisite "specific intent to
defraud," *see United States v. Gelb*, 700
F.2d 875, 879 (2d Cir.) *cert. denied,* 464
U.S. 853, 104 S.Ct. 167, 78 L.Ed.2d 152
(1983), satisfactorily pleaded through facts
showing defendants' "motive for commit-
ting fraud and a clear opportunity for do-
ing so," *Beck v. Manufacturers Hanover
Trust Co.*, 820 F.2d 46, 50 (2d Cir.1987),
*cert. denied,* — U.S. ——, 108 S.Ct. 698,
98 L.Ed.2d 650 (1988). Since securities
transactions, by their nature, necessarily
involve the mails and wires, their use was a
reasonably foreseeable consequence of de-
fendants' allegedly fraudulent scheme.
*See United States v. Carpenter*, 791 F.2d
1024, 1035 (2d Cir.1986). Although specific
dates for such communications have not

---

**6.** Berine, named as the enterprise in the Thirti-  eth Claim, is not a defendant therein.

been alleged, the court is satisfied that the complaint approximates such events as the mailing of prospectuses with sufficient particularity to survive this motion to dismiss. Of course, after discovery plaintiffs may very well be expected to articulate with more precision each act of racketeering they rely on in furtherance of their claim. *Cf. United States v. Davidoff*, 845 F.2d 1151, 1153 (2d Cir.1988) (reversing RICO conviction for government's failure to identify prior to trial each corporate victim of alleged extortion scheme).

### (3). A "Pattern" of Racketeering Activity

The question of what constitutes a "pattern of racketeering activity" is one that neither the Supreme Court nor the Second Circuit has found easy to answer. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. at 496, n. 14, 105 S.Ct. at 3285, n. 14; *Beauford v. Helmsley*, 843 F.2d 103, 105 (2d Cir.1988) (rehearing en banc granted with *United States v. Indelicato*, No. 87–1085, on April 1, 1988); *Creative Bath Prods., Inc. v. Connecticut Gen. Life Ins. Co.*, 837 F.2d 561, 564 (2d Cir.1988); *Furman v. Cirrito*, 828 F.2d 898, 903–10 (2d Cir.1987) (Pratt, J., dissenting).

▮ Despite the turmoil reflected in these cases, this court finds that plaintiffs have adequately pleaded a pattern of racketeering activity under § 1962(c) of RICO. The allegations deal with four separate public offerings of securities over a period of four and one-half years, as well as the purportedly fraudulently-induced merger of two of the subject companies. It does not appear from the record that defendants had one finite goal when they started their allegedly wrongful activities. Instead, their scheme expanded over time to take advantage of new opportunities that presented themselves. In this respect, the facts seem plainly distinguishable from *Beauford* and sufficient to merit further discovery.

### (4). Causation

▮ *Sedima, S.P.R.L. v. Imrex Co., supra*, makes clear that the compensable in-

jury in a civil RICO case is the harm caused by predicate acts sufficiently related to constitute a pattern. 473 U.S. at 497, 105 S.Ct. at 3286. Plaintiffs, having adequately alleged both transaction and loss causation as a result of defendants' alleged predicate securities fraud, thereby satisfy the causation requirement of their alleged RICO claims. Accordingly, defendants' motion to dismiss plaintiffs' RICO claims is denied.

### b. Conspiracy to Violate RICO

▮ To state a claim for RICO conspiracy, plaintiffs must allege that each defendant agreed to commit two predicate acts of racketeering. *See United States v. Teitler*, 802 F.2d 606, 613 (2d Cir.1986). Although it is possible to read the complaint so as to find two or more alleged predicate acts by each RICO defendant, the commission of the acts is distinct from an agreement to commit them. *United States v. Benevento*, 836 F.2d 60, 73 (2d Cir.1987); *see United States v. Bonanno Organized Crime Family of La Cosa Nostra*, 119 F.R.D. 625 (E.D.N.Y.1988). Plaintiffs having failed to plead an agreement by each defendant to commit two predicate acts, the Twenty–Seventh, Twenty–Ninth and Thirty–First claims of the Amended Complaint are dismissed.

Plaintiffs are, however, granted leave to further amend their complaint to replead RICO conspiracy.

### B. Rule 9(b)

Defendants challenge plaintiffs' compliance throughout the complaint with Fed.R. Civ.P. 9(b)'s requirement that allegations of fraud be pleaded with particularity.

▮ Particularity does not mean plaintiffs must plead their evidence. *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d at 379. Moreover, where, as here, a conspiracy is alleged, "great leeway" is allowed since, by the nature of conspiracy, details may not be readily known at the time of pleading. *Kravetz v. Brukenfeld*, 591 F.Supp. at 1387–88. This principle is especially applicable in "market manipulation" cases since the particulars of such frauds

are generally exclusively within defendants' control. *See Rooney Pace, Inc. v. Reid*, 605 F.Supp. at 162–63.

Rule 9(b) seeks to advance three major goals: (1) fair notice to defendants of plaintiffs' claims; (2) protection of defendants' reputation or goodwill; and (3) reduction of strike suits. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987). Thus where a complaint gives each defendant notice of precisely what he is charged with, "no more is required by Rule 9(b)." *Goldman v. Belden*, 754 F.2d at 1070.

In this case, the court finds the detailed factual allegations as to the events surrounding each stock offering sufficient to provide the general circumstances, content and perpetrator of each fraudulent representation at issue and, therefore, to satisfy Rule 9(b). *See DiVittorio v. Equidyne Extractive Indus. Inc.*, 822 F.2d at 1247. Insofar as certain officers of Cabletech and Primages are charged with fraud in connection with the Cabletech merger, the law does not require that a plaintiff, at the pleading stage, particularize the precise conduct of such insiders. *Id.* at 1247–49.

Accordingly, defendants' motion to dismiss the complaint for failure to plead fraud with particularity is denied.

### C. *Pendent Jurisdiction*

Plaintiffs, having stated claims under the federal securities laws and RICO may pursue their pendent state claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

### D. *Statute of Limitations*

Defendant Sherman Fitzpatrick moves to dismiss plaintiffs' state law claims of negligence and breach of fiduciary duty as untimely. It argues that because the last transaction it engaged in relevant to these claims was the September 1982 sale of Cabletech, and because the complaint was not filed until June, 1987, the actions are brought outside the relevant three-year statute of limitations. N.Y.Civ.Prac.L. & R. § 214(4); *see Loengrad v. Santa Fe Indus., Inc.*, 573 F.Supp. 1355, 1359 (S.D.N.Y.1983).

Although plaintiffs seem to concede the applicability of a three-year statute of limitations, arguing that the statute was tolled by Sherman Fitzpatrick's concealment of its wrongdoing, this court does not find § 214 applicable. Increasingly, New York courts are applying a six-year statute of limitations, N.Y.Civ.Prac.L. & R. § 213(2), to negligence actions brought against professionals by clients with whom they have a contractual relationship. *Video Corp. v. Frederick Flatto Assoc.*, 58 N.Y.2d 1026, 462 N.Y.S.2d 439, 448 N.E.2d 1350 (1983); *Sears Roebuck & Co. v. Enco Assoc., Inc.*, 43 N.Y.2d 389, 401 N.Y.S.2d 767, 372 N.E. 2d 555 (1977); McLaughlin, McKinney's Supplementary Practice Commentary § 213:2 (1985). Plaintiffs' claims having been timely filed pursuant to § 213(2), the motion to dismiss the state law claims is denied.

### E. *Costs and Attorneys' Fees*

Sherman Fitzpatrick's motion for costs and attorneys' fees is denied. *See Eastway Constr. Corp. v. City of New York*, 762 F.2d 243 (2d Cir.1985), *cert. denied*, —— U.S. ——, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987).

### CONCLUSION

Defendant's motions to dismiss plaintiffs' Fourth claim is granted as against all but Michael and Irene Riegel. Plaintiffs' Fifth, Sixth, Seventh and Eighth Claims are dismissed in their entirety. Plaintiffs' Twenty–Seventh, Twenty–Ninth and Thirty–First Claims are dismissed with leave granted to replead. In all other respects defendants' motions to dismiss are denied.

SO ORDERED.